TOWN OF RANDALL, Respondent, vs. ROVELSTAD and another, Appellants.

*December 18, 1899 — February 2, 1900.*

*Highways: Dedication: Ancient record: Presumptions: Evidence: User: Prescription.*

1. A finding that land lying near a highway had been dedicated as part of such highway, based on the acts of the owner in building fences, no other of his acts being shown from which to infer *animus dedicandi,* is *held* to be contrary to the undisputed evidence as to the location of such fences.

Town of Randall vs. Rovelstad and another.

2. Where effect is to be given to an ancient record establishing the fact that a highway was laid out according to the course therein described, acts, done at a period more than forty years before, are properly to be ascribed to a recognition of the highway laid out, and not to a purpose to dedicate.

3. The formal entry of a survey of a highway in a recognized record book of a county, made by an official person, raises a strong presumption that such recording was intended as the official act, required to be done by the statute then existing, commanding the road to be recorded when all preliminaries had been duly complied with.

4. From such an official act, required and authorized only after certain preliminary steps, after the lapse of many years has made proof of the facts by ordinary evidence impossible, a presumption arises that such steps were in fact taken.

5. Where a highway is shown, extending about three miles practically without deviation from straight lines except such as are explained by topography, substantially corresponding with an ancient recorded survey, confined by fences, existing before the memory of any living witness, but not, so far as appears, before such recorded survey, such record should be received in evidence as a recording of a highway in compliance with the statute then existing, and when received raises a presumption that a highway as therein described was duly laid out.

6. The legal opening or establishment of an ancient highway may be proved by hearsay or by reputation; and where such reputation can only be ascribed to a recorded survey and is at all times consistent with it, evidence of official recognition, and of declarations as to its reputation, as a legal highway by abutting owners and others, is *held* to establish the legal opening thereof.

7. The vital principle of dedication is the intention to dedicate, and whenever this is unequivocally manifested the dedication, so far as the owner of the soil is concerned, is complete, but if any reasonable consideration, personal to himself, exists why the owner leaves unenclosed a space beside a highway, it will tend strongly to rebut the inference of intention to dedicate.

8. The changing of an existing fence along the line of a highway was followed by thirty years nonenclosure. *Held*, that user by the public, in the absence of some act or acquiescence on the part of the owner, did not establish the intent to dedicate.

9. Proof of user, to establish a prescriptive right to land outside the limits of an established highway, must be clear and definite, and any mere deviation beyond the bounds, which may be accounted for by topographical difficulties or carelessness of travelers as to the true line, must be presumed not to be adverse.

Town of Randall vs. Rovelstad and another.

APPEAL from a judgment of the circuit court for Kenosha county: FRANK M. FISH, Circuit Judge. *Reversed.*

It appeared upon the trial that from an early day — before the memory of any of the witnesses, which ran back as far as 1843 — a traveled road existed, known as "the Kenosha and Lake Geneva road," also as the "Bullin's Bridge and Lake Geneva road," coming two or three miles from the eastward, and crossing a creek at the northeast side of Power's Lake, in Kenosha county, running thence northwesterly to a point in the county line, being the west line of section 7, township 1 N., range 19 E., at a point about ten chains south of the quarter stake. The north shore of Power's Lake is a few rods south of the section line between sections 18 and 7, which is the present town line between the town of Wheatland and the town of *Randall*, in Kenosha county. The defendant has occupied a space, partly in section 18 and partly in section 7, and extending from said road to the shore of said lake, a distance, as occupied, of about ninety feet on the westerly line and about sixty feet on the easterly line, a portion of which is claimed by the town to be part of the highway. Its corners are designated on plat as E., F., G., H. In a duly authenticated record book of the county of Racine, of which Kenosha was then a part, there appear, following a meeting of the board of county commissioners on April 8, 1840, surveys of several roads, among others a road corresponding substantially with the course of the traveled road in question; but the book contains no record of the adoption of said road by the county commissioners nor of the submission of any report of viewers with reference thereto. This was adopted into the highway records of Kenosha county, which was erected out of Racine county in 1850. It appeared that fences were built certainly prior to 1850, and by one witness carried back to 1846 or earlier, corresponding substantially with the road described in that survey, and that the town officers recognized and worked it from a very early day. It also appeared that in

the autumn of 1840 the county commissioners of Walworth
county recognized this highway as laid out by laying out a
road extending from its terminus to Lake Geneva, and de-
scribing the starting point as a place on the county line at
the terminus "of a highway recently run from Bullin's
Bridge." It appeared also that in 1894 the town of Wheat-
land, at a point a few rods northwest of the premises in ques-
tion, recognized the lines of that highway as surveyed, and
corrected deviations of travel therefrom. It was also shown
that the court house of Racine county burned in 1861, and
that many of the papers with reference to ancient highways
could not be found. The record book in question showed
that the first two or three years of the existence of Racine
county, commencing in 1838, there was great activity in the
laying out of highways, great numbers of petitions being
filed, and great numbers of surveys of highways being re-
corded. The first instance in said record book where a sur-
vey of a highway is recorded occurs under the following
circumstances: In the record of the meeting of commission-
ers it is stated that two specified highways were adopted.
Immediately following the record of the meeting is recorded
survey of those highways in exactly the same form as the
survey of the highway in question. Thenceforward a ma-
jority of the meetings of the board of commissioners are
immediately followed by the record of surveys of one or
more highways in exactly the same form as those following
the first meeting, but with no entry in the record of the
meeting itself of any action with reference thereto. These
records are entirely indiscriminate in form; some of them
indicating a signature by a surveyor, some indicating an ac-
companying report of viewers, and some of them without
either. Except for such records, there is no record of the
adoption or laying out of any highway during the period
while the subject was under the control of the county com-
missioners. Among the highways thus recorded are many

of the best known and most important highways in Racine
and Kenosha counties, and among the six which are recorded
together, including the one in question, following the meet-
ing of April 8, 1840, is the main street of the city of Racine,
extending from the public square northward to and across
the river, upon which were located all the early business
buildings of that city, and on which is now located the city
hall.

Upon the accompanying diagram the lines WX and YZ
indicate the location of the highway, as so recorded, past
the property in question.

At an early day, and apparently about 1846, the owner
of the land in question, together with a considerable tract
to the north and west of it, and which lay on both sides of

the road, ran a fence on the north side very nearly approximating a line two rods from the center of the road according to said survey. Afterwards he laid a fence, irregular in course, along the southerly side of said highway, which, to the northwestward of the parcel here in question, deflected some distance southerly from the surveyed line in order to accommodate a deflection of the travel made necessary by a slough impinging on the northerly side of the highway as surveyed. After thus deflecting, the fence returned more nearly toward the surveyed line, and reached a point indicated by the letter "A" upon the diagram, where there is a tree which stands about ten feet south of the line of the highway as surveyed. From that point the course of the fence to the lake is indefinite, and seems not to have followed any line, but to have continued southeastward and southerly. The land at that point was brushy and sandy. In 1867 and 1868, one Benson, having become the owner of the land on both sides of the road, rebuilt the fence along the southerly side of the road by post and board fence, but, instead of following the curve of the old fence around to the point "A," he ran it more to the southward and direct to the lake; and he testified, without dispute, that he did so, not with the intention of dedicating, but in order to save fencing, as the land there was sandy and worthless for pasture, and by thus running straight down to the lake, instead of following the curve of the old fence, he saved about four lengths of fence. Meanwhile the fence on the northerly side of the road had been changed from time to time in places. At the point of the slough or marsh in question it was moved southerly two or three times, in order, as the person moving it testified, to make a better path for cattle inside the fence. Later it was moved still further southward, pretty much its whole length, which is explained by the then tenant of the farm, who made the change, by the fact that he understood the road was a three-rod road, while the old fence was adjusted to a four-rod.

Upon the accompanying diagram the dotted line south of the surveyed highway lines, from B to A and onward, indicates approximately the line of the old rail fence existing prior to 1868, and so old at that time that another fence was substituted for it.  Its location is not definite, except that from the point B it extended past the tree (A) just about ten feet south of the highway line, and thence southeastward through the present location of defendant's shed, which is located in the northeast corner of the premises claimed by him, and thence to the lake.  The line from B to D represents the post and board fence built by Benson in 1868.  Some time about 1878 a tenant of the premises discarded the fence from C to D, and built a fence from C directly south to the lake.  The point C is the initial point adopted by the circuit court in describing the south line of the highway as adjudged.  About 1895 the defendant, having purchased the premises above mentioned, built a house facing the lake, which extended northward approximately to the town line.  He built a picket fence about five feet southerly from the line of the highway according to the recorded survey, and in the northeast corner of his premises built a wagon shed, the northeast corner of which is about one foot south of the picket fence and approximately on his east line.  The court found that for more than forty years there had existed a highway dedicated and thrown open to the public by the owners of the property on both sides thereof, and that the south line of said highway commenced at the point C, and extended along the line of the board fence of 1868.  He made no finding as to the line of the highway southeastward from the point C.  He accordingly found that the cottage extends about thirty feet into said highway, that the picket fence and shed are wholly within said highway, and that said structures constitute an obstruction of the highway, and prevent the public from traveling over the same.  It should be noted that of the picket fence only about sixteen feet is south of the town

line so as to be within the town of *Randall*. It further appeared that in 1894 one McGarry, then owning the *Rovelstad* premises and other property to the westward, had some controversy with the town of Wheatland, as a result of which they agreed with him upon a line for the southerly side of the highway in accordance with the picket fence above described, and three or four feet southerly from the line, according to the survey, on condition of his grading a suitable track across the slough, which he accordingly did, and adjusted his premises to the line so agreed upon. The preponderance of the evidence establishes that the general course of travel northerly of the *Rovelstad* premises has extended over the space between the present picket fence and the fence on the north side of the street, but the general course thereof has been such that the picket fence impinges thereon about three feet, and that, after passing the point A, the old line of travel deflected southerly from the surveyed line in order to pass around the slough, which was impassable until 1894. There is evidence of occasional travel turning from the surveyed line and passing southerly of the tree A. No work has ever been done on the highway opposite the *Rovelstad* premises, the soil there being sandy and gravelly, so as not to require working as much as other parts of the road. Other parts of the highway have been worked by the town authorities.

The court rendered judgment enjoining defendant to remove all structures from the premises north of the line BC, from which judgment defendants appeal.

For the appellants there was a brief signed by *Cooper, Simmons & Nelson*, counsel, and oral argument by *J. B. Simmons*. They contended, *inter alia*, that an ancient record, found in proper custody, having the appearances of genuineness and of being made at the time it purports to have been made, is accepted as proof without other authentication, and it is presumed therefore that every preliminary act

required to entitle such record to be made was legally and properly done. *Webster v. Boscawen*, 67 N. H. 111; *Willey v. Portsmouth*, 35 N. H. 303; *State v. Alstead*, 18 N. H. 59; *Hayward v. Bath*, 38 N. H. 179; *Enfield v. Ellington*, 67 Conn. 459; *Aldrich v. Griffith*, 66 Vt. 390; *Dodge v. Briggs*, 27 Fed. Rep. 160; Stats. 1898, sec. 2216*b*; *McClaskey v. Barr*, 47 Fed. Rep. 154; *Lessee of Ward v. Barrows*, 2 Ohio St. 241; *Bank of U. S. v. Dandridge*, 12 Wheat. 64; *Santana L. S. & L. Co. v. Pendleton*, 81 Fed. Rep. 784; *Pendleton v. Shaw*, 18 Tex. Civ. App. 439; *Applegate v. Lexington & C. C. M. Co.* 117 U. S. 255; *Bell v. Brewster*, 44 Ohio St. 690. In the acquisition of a highway by prescription, the user must be adverse and under claim of right, and not merely permissive. Elliott, Roads & S. 137; *Pentland v. Keep*, 41 Wis. 490; *Gentlemen v. Soule*, 83 Am. Dec. 264; *Manrose v. Parker*, 90 Ill. 581; *State v. Welpton*, 34 Iowa, 144; *State v. Schilb*, 47 Iowa, 611. User and fencing-out would not make a highway by dedication, in the absence of express proof that there was an intention to set up a new or different highway from that established by a recorded survey. Elliott, Roads & S. 92, 97, 120; 5 Am. & Eng. Ency. of Law, 398, 400–404; *State v. Welpton*, 34 Iowa, 144, 147; *Manrose v. Parker*, 90 Ill. 581; *Ayers v. Reidel*, 84 Wis. 283. When the situation of land is such as to indicate that it does not form a part of the way, although it may be alongside of the way, and may be used by the public, no dedication can be presumed, without strong evidence of an intent to devote the land to the use of the public. Elliott, Roads & S. 131; *Gowen v. Philadelphia Exch. Co.* 40 Am. Dec. 489; *Biddle v. Ash*, 2 Ashm. 211; *Griffin's Appeal*, 109 Pa. St. 150; 9 Am. & Eng. Ency. of Law (2d ed.), 40, note; *Rozell v. Andrews*, 103 N. Y. 150; *Quinn v. Anderson*, 70 Cal. 454; *Wheatfield v. Grundmann*, 164 Ill. 250; *Omaha v. Hawver*, 49 Neb. 1; *Holly Grove v. Smith*, 63 Ark. 5; *De Grilleau v. Frawley*, 48 La. Ann. 184; *Tutwiler v. Kendall*, 113 Ala. 664; *Ottawa*

Town of Randall vs. Rovelstad and another.

*v. Yeutzer*, 160 Ill. 509; *Steinauer v. Tell City*, 146 Ind. 490; *Baker v. Squire*, 143 Mo. 92; 9 Am. & Eng. Ency. of Law (2d ed.), 36, 38; *O'Connell v. Bowman*, 45 Ill. App. 654.

For the respondent there was a brief by *Quarles, Spence & Quarles*, and oral argument by *Geo. Lines*. They contended, *inter alia*, that the record of the highway was not admissible in evidence as an ancient document, without authentication, and being admitted did not prove the laying out on the line described therein. Elliott, Roads & S. 293, 294; *Williams v. Giblin*, 86 Wis. 147; *Dunstan v. Jamestown*, 7 N. Dak. 1; *Prescott v. Beyer*, 34 Minn. 493; *Dolphin v. Pedley*, 27 Wis. 469; *McKee v. Hull*, 69 Wis. 657; *Meegan v. Boyle*, 19 How. 130; *Fell v. Young*, 63 Ill. 106; *Boyle v. Chambers*, 32 Mo. 46, 64; *Lau v. Mumma*, 43 Pa. St. 267–274; *Merrill v. Kalamazoo*, 35 Mich. 218. When it appears that the public have for more than twenty years continuously occupied the land in question as a highway, without any evidence that such use was permissive only, the presumption is that the use was adverse from the beginning. *Carmody v. Mulrooney*, 87 Wis. 552; *Wilkins v. Nicolai*, 99 Wis. 178; *Nelson v. Jacobs*, 99 Wis. 547–559; *Wollman v. Ruehle*, 100 Wis. 31; *Meyer v. Hope*, 101 Wis. 123. Defendants are estopped by the conduct of their grantors in fencing out the strip in question and permitting the public to use it as a highway without question for more than twenty years. *Cunningham v. Hendricks*, 89 Wis. 632; *Reuter v. Lawe*, 94 Wis. 300.

Dodge, J. The existence and limits of the highway as adjudged to be obstructed depend upon finding 2, to the effect "that for more than forty years last past there has been, and now is, a public highway running, . . . which said highway was at some time more than forty years ago dedicated and thrown open to the public by the owners of the adjacent property upon both sides thereof, and said

highway has been accepted by the public, and has been duly worked by the proper public authorities, and during all the time aforesaid has been continuously and extensively used and traveled by the residents of said town and the public generally; that the south line of said road, as established by the evidence, is shown by a dotted line, marked 'old fence line'" (line CB on diagram). This finding is ambiguous in several of its elements. It clearly, however, finds as fact that the entire highway from Bullin's Bridge to the county line was dedicated and not laid out; and, secondly, that all of the premises north of the line CB on the above diagram were dedicated as a part of the highway more than forty years ago. As to this second proposition, the only evidence of dedication "more than forty years ago" is the fact that from prior to 1843 there was a traveled road on substantially the course of the survey; that at some time prior to 1850 a fence was built along the northerly line thereof, substantially corresponding with the north line of the surveyed road; and that at some later time, not fixed but soon after, an irregular rail fence was built south of said traveled course, varying substantially from the south line of the surveyed highway. If the conclusion of dedication is predicated upon the acts of the owner in building fences — and there are no other acts of his from which to infer *animus dedicandi* — it is contrary to the undisputed evidence as to the location thereof. The testimony of W. S. Benson and Fred Borck is uncontradicted to the effect that the only fence built south of the traveled way forty years ago ran past the tree (A), and on a line through the wagon shed now situated in the extreme northeastern corner of the premises claimed by the defendant. This line is far north of that described in the findings, and is such as to exclude from the highway all of the defendant's cottage, and some portion, at least, of the wagon shed and the outhouse adjoining it on the south. If the evidence on this subject

were conflicting, and at all approximated equality of preponderance on either side, the finding of the court below must, of course, control; but where, as here, not alone the great preponderance, but all the evidence, is contrary to the finding, it cannot be allowed to stand. The testimony of Michael Katzenberg is suggested as in conflict with that of Benson, but a careful examination makes the contrary clear. Katzenberg testifies to a fence building in 1867, which commenced at the extreme western portion of Benson's premises, and ran southeastward about forty rods. This would not have brought him even to the point B. He testifies that from the end of said forty rods, instead of continuing a post and board fence, he merely repaired and left in place the old rail fence, and that he left that region of country in the spring of 1868, and knows nothing of what occurred thereafter. The testimony of Benson is that his work was done in 1868; that he commenced at about the present McGarry cottage, which is westward of the point B and consistent with Katzenberg's stopping place, and continued the post and board fence for some distance along the line of the old rail fence, and then deflected therefrom, and ran direct to the lake on the line BC. We are constrained to hold, therefore, that the finding of a dedication of all north of that line more than forty years ago is contrary to the evidence, and must be set aside.

We next come to the consideration of the other portion of the finding, to the effect that the highway generally was dedicated, as distinguished from being laid out. This conclusion was undoubtedly reached by the trial court by dismissing from his consideration the record of survey of 1840, as counsel on both sides seem to agree. If he had given it effect as a record, establishing the fact that a road was laid out according to the course there described, the conclusion of dedication, of course, could not have been reached, for the acts done at the period specified in the finding — more

than forty years ago—would then have been properly ascribed merely to recognition of the highway laid out, and not to a purpose to dedicate one. *Manrose v. Parker*, 90 Ill. 581; *Larry v. Lunt*, 37 Me. 69.

Upon examining the force of this record, we find that in 1840 the law vested the laying out of highways in the county board of commissioners. The procedure consisted in a petition presented to them by ten freeholders, with certain specified qualifications, and the appointment of three electors as viewers. The viewers were required to take an oath, to proceed to view the route proposed, and, if deemed by them of public utility, to lay out and mark such road on the ground. They were then required to make a certified report of their proceedings to the next ensuing session of the county board, when the same was to be publicly read, "and, if no objections be made to such proposed highway, the said board shall cause a record thereof to be made, and order the said road to be opened and repaired a necessary width, not exceeding sixty-six feet, which shall thenceforth be a public highway." Terr. Stats. of 1839, p. 107, § 6. The county of Racine was organized by the legislature in 1838, and the first meeting held April 2 of that year. As was to be expected in a new and sparsely settled but rapidly settling country, the question of the location of highways immediately became an important one, and, commencing with the meeting of June 25, 1838, the petitions therefor became very numerous. The first indication in the records of the laying out of any highway occurs at the meeting of July 30, the records of which meeting disclose: "A survey of the road from Southport to the United States road near the house of Jesse Foster was presented and approved. Also the survey of an alteration of a road south from Southport to the state line of state of Illinois, presented and approved." Immediately following the record of this meeting appear recorded the surveys of these two roads. The first is simply the survey,

without signature of surveyor or report of the viewers. The second bears the signature of the surveyor and the statement, "Surveyed July 28th, 1838." The regular meeting of the board of January 7, 1839, is immediately followed by the survey of a road from Beloit to Lake Koshkonong, bearing the signature of the surveyor, and also report of the viewers, in the following words: "To the Commissioners of Racine County: We have viewed and surveyed the road from Beloit to Lake Koshkonong, and ask the same to be located. Beloit, 27th December, 1838." The records of the meeting do not record any action of the board thereon. A change in county clerks had taken place between these two meetings. Thence onward to the close of 1841 appear great numbers of surveys of roads, many in forms above suggested; some bearing a certificate, more or less full, by the viewers, but few of them going further than to certify a survey; practically none of such certificates even purporting to set forth the proceedings taken by such viewers. As set forth in the statement of facts, the meeting of April 8, 1840, is in like manner followed by the surveys of six roads, whereof one bears a certificate by viewers, three, including the road in question, the formal signature of the surveyor, and two no signatures at all. At various preceding meetings are found the presentation of petitions for highways, not set forth sufficiently to positively identify them with the roads afterwards surveyed, although the one for the road in the village of Racine, recorded at the same time and in the same manner as the one in question, is capable of identification; and a petition signed by Bullin may well have related to the road from his bridge northwestward, now under consideration.

From this summary of the situation the conclusion seems to us irresistible that the formal entry of the survey of a road in this the recognized record book of Racine county, made by an official person, can have been due to no other

purpose than to comply with the statute above recited, com-manding that the road be recorded. There is no other jus-tification for the county clerk to incumber the official rec-ords with these long descriptions. It is not to be presumed that a formal act of that sort is a wholly vain thing, and, if not vain, then it must be assumed that it is done in intended compliance with the law. A very strong presumption arises from the course of procedure that the construction placed by the county officers upon the statute was such as to be satisfied with the mere recording of the survey, which con-struction is not at all unreasonable, inasmuch as all that needs to be positively preserved is the description of a road so as to define the location. The records following the first meeting show that a recording of anything more than the survey was not understood to be necessary. The fact, also, that of all the important highways which were located dur-ing the first three years of the country's existence no other or different recording was made than as to the road in ques-tion, renders irresistible the conclusion that such recording was intended as and supposed to be the official act required to be done by the statute when all the preliminaries had been duly complied with. From such an official act, which is required and authorized only after certain preliminary steps, results a presumption that such steps were in fact taken, when, as here, the lapse of many years has made proof of the facts by ordinary evidence impossible. *Van Buren v. Downing,* 41 Wis. 122, 128; *State v. Alstead,* 18 N. H. 59; *Bank of U. S. v. Dandridge,* 12 Wheat. 70; *Dodge v. Briggs,* 27 Fed. Rep. 160; *Webster v. Boscawen,* 67 N. H. 111. We conclude that this record should have been received as a recording of a highway in compliance with the statute, and that it raises a presumption that a highway as therein de-scribed was duly laid out.

Even if this recorded survey were not sufficient to estab-lish the fact of a legal laying out, it would, as respondent

concedes, suffice to define the course of a highway, shown by other evidence to have been established legally. Long occupation and use of a highway is itself strong presumptive evidence of an original laying out. Elliott, Roads & S. 133, 135; *Reed v. Northfield*, 13 Pick. 94; *Webster v. Boscawen*, *supra*. Here we have a highway extending some three miles practically without deviation from straight lines, except such as are explained by the topography, including one due east and west course more than a mile long, which is inconsistent with all experience in establishment of highways only by travel; a highway existing before the memory of any witnesses presented, but not, so far as appears, before the survey of 1840; and confirmed by fences located very early, and substantially corresponding with the survey, except for explained deviations.

The legal opening or establishment of an ancient highway may also be proved by hearsay, or even by reputation. 2 Jones, Ev. §§ 304, 305; 1 Greenl. Ev. (15th ed.), § 128; *Willey v. Portsmouth*, 35 N. H. 303, 310; *Webster v. Boscawen*, *supra*. In the autumn of the same year as the survey, this road is recognized as a laid-out road having a definite location by the county board of the adjoining county of Walworth. Upon the creation of Kenosha county out of part of Racine county in 1850, it is recognized as one of the legal highways, and the survey record under consideration was included among the " official highway records " of the new county. In 1881 men working on the road declared its reputation as a legal highway with defined three-rod limits. In 1890, Mr. Reed, who had owned the land on both sides from 1880, declared the reputation of the highway as one having legal limits substantially in accord with the survey, and ascribed that reputation to statements of the town officers. Finally, in 1894, the town officers of Wheatland recognized it as a road having legal limits different from the course of travel where the same had been deflected to

avoid an impassable place, and applied the survey in question as that upon which the road has been laid out. With absolutely nothing in contravention, this reputation and conduct of itself would suffice to prove the fact that the highway in question had been legally laid out by proper authority; and as it commences with the recording of the survey in question, and is at all times consistent with it, and as there is nothing else to which such reputation can be ascribed, we conclude that such character is established by the evidence and the location of the road by the record of the survey in the county records.

It being established that the highway in question, generally speaking, was not created by dedication, and that the exact *locus in quo*, being outside of said surveyed highway, was not dedicated in the original fencing out of the road more than forty years ago, the judgment cannot stand, unless it can be supported by some subsequent fact sustained by a preponderance of the evidence, as to which we have no finding by the court below to aid us. It is contended that the acts of the owner in changing the fence in 1868, followed by nearly thirty years of noninclosure and user, establishes either a dedication at that time, or establishes a right of occupancy for a highway by prescription. Respondent's attitude as between these two positions is not very clearly defined. Dedication, as we have said, rests upon the intent of the dedicator. User alone is not sufficient to establish that intent, but must be accompanied by some act or acquiescence on the part of the owner. Elliott, Roads & S. 92; Angell & D. Highways, § 151; *Gardiner v. Tisdale*, 2 Wis. 194; *Eastland v. Fogo*, 66 Wis. 133, 135; *Bates v. Beloit*, 103 Wis. 90; *Chicago v. C., R. I. & P. R. Co.* 152 Ill. 561; *Harding v. Jasper*, 14 Cal. 642, 649. This, of course, does not mean that there must be in all cases direct evidence of an expressed intent, but that the events, among which long-continued user may be very important, create a firm

belief that the owner did actually intend to dedicate; and these events may be strong enough to overcome direct testimony of the owner denying such intent, for such testimony, being to a mental state of which no one but the person himself can have any knowledge, yields readily to acts and circumstances inconsistent therewith. Elliott, Roads & S. 92 *et seq.* Such intent is not, however, to be inferred lightly, or from ambiguous acts open to other construction. An owner should and must have the right to deal with his land as he will, and his conduct with reference thereto should be construed most favorably to the retention of his ownership, rather than to relinquishment thereof. The law carefully protects the owner from devolution of title for other purposes by requiring formal writing over his own signature, and, if that requirement is to be relaxed in case of dedication to the public, the acts necessary to accomplish that result should approximate the written instrument in freedom from uncertainty as nearly as possible. *Badeau v. Mead,* 14 Barb. 339; *Cunningham v. Hendricks,* 89 Wis. 632. The limits of the doctrine of dedication by acts, as quoted and adopted from Angell in *Eastland v. Fogo, supra,* should be kept in mind: "The vital principle of dedication is the intention to dedicate,— the *animus dedicandi,*— and, whenever this is unequivocally manifested, the dedication, so far as the owner of the soil is concerned, has been made." While long continued user by the public is a very persuasive consideration, as said in many cases, its significance depends greatly on the circumstances, the character of the land, the shape of the uninclosed parcel, the character of the use, as whether continuous and uniform or occasional, whether passage over it is as a highway or only in the nature of a wandering from an adjoining road,— all these and many other circumstances may have great weight in determining whether an owner's apparent abandonment of his property is with intent to dedicate to the public use or merely to forego the use of it himself until such time as he needs it.

In the present case the reason of the deflecting of the fence so as to leave open the premises in controversy is fully explained, and is entirely reasonable and credible. The economizing of a few lengths of fence was doubtless, in 1868, much more to be considered than any gain from the pasture of a brushy and sandy knoll immediately adjoining this body of water. Again, the shape of the premises discarded is such as to be inconsistent with the idea of dedication as a part of the highway. A highway, in its ordinary conception, is a strip of land bounded by approximately parallel boundaries for the purpose of direct travel. It does not include the idea of bays or excrescences on either side of it, not within the direct course of travel, and not adapted thereto, such as the triangle left open in 1868. We think the case falls clearly within the reason stated in *Biddle v. Ash*, 2 Ashm. 211, 220, and *Griffin's Appeal*, 109 Pa. St. 150, that if any reasonable consideration, personal to himself, exists. why the owner leaves uninclosed a space beside a highway, it will tend strongly to rebut the inference of intention to dedicate. Again, as we shall more fully point out in discussing the question of prescription, there has been no such user of any part of the premises inclosed by the old rail fence and thrown open by the fence of 1868 as to imply a consent or purpose on the part of the owner that they should become part of the highway. Almost the only use that is shown to have been made thereof is for the purpose of penning and washing sheep,— a use inconsistent, rather than consistent, with a road, and of which knowledge by the owner, even accompanied by consent, would hardly at all tend to indicate that the premises so used were to become highway.

In considering the question of prescription, the element of consent is, of course, eliminated. The right of public highway by prescription is predicated upon adverse user so long continued as to imply a presumption, not necessarily of a grant, but of an original legal establishment of the high-

Town of Randall vs. Rovelstad and another.

way.   Elliott, Roads & S. 134;   *Reed v. Northfield*, 13 Pick.
94.   By common law this user should be for twenty years
to establish this conclusion; by statute (sec. 1294, Stats.
1898), it need be for only ten years, but must be accom-
panied by working.   An examination of all of the evidence
in the light of the map adopted by the court, giving it its
utmost force, establishes no customary, nor even casual,
travel over any part of the lands in controversy, namely,
those situated within the town of *Randall*, except over a
strip about three feet wide along the sixteen feet of fence
built by the defendant south of the town line.   There is evi-
dence to the effect that the main traveled track, as it existed
prior to 1894, was invaded about three feet by the picket
fence.   There is also testimony that, after passing beyond
this sixteen feet toward the northwest, travel at times has
deflected to the left so far as to pass to the south of the tree
(A), and some witnesses carry it as far south as within a
couple of feet of the north end of the house.   But this is all
outside of the town of *Randall*, and within the triangle in
the town of Wheatland, and therefore is not involved in this
controversy.   Such travel also appears to have been only
casual.   As to this sixteen-foot strip three feet wide, prac-
tically parallel to the course of travel, the evidence is by no
means clear how long that travel had continued in the same
place.   It is shown that the whole road north of the *Rovel-
stad* property has been in equally good condition for travel,
has never required any repair or attention from the town,
and that the travel has extended at different times all over
that space, even to the line of the north fence as originally
located, a rod or more north of the present north fence.   No
witness testifies as to any period of time during which the
course of travel had been continuously such as to be invaded
by defendant's structures.   Proof of user, to establish a pre-
scriptive right outside of the limits of an established high-
way, should be clear and definite.   *State ex rel. Lightfoot v.*

*McCabe*, 74 Wis. 481, 484. More so than is necessary to establish the use of a general strip of land as a highway, where, although the travel during the twenty years may have been distributed over its whole width, and not persistently over any part, it serves to prove a use of a strip of the ordinary width as highway. *Bartlett v. Beardmore*, 77 Wis. 356. All the presumptions are against the acquisition of rights outside of those limits. The public welfare does not demand that highways should be broadened by the acts of those who travel over them; and any mere deviation beyond their bounds, which may be accounted for by topographical difficulties, or by carelessness of travelers as to the true line, will be presumed to be not adverse and not accompanied by a claim of right, more strenuously than acts within such limits, especially when such deviations have not been sanctioned by the making of repairs. *Manrose v. Parker*, 90 Ill. 581, 584; *State v. Schilb*, 47 Iowa, 611, 613; *State ex rel. Lightfoot v. McCabe*, 74 Wis. 481. This court has repeatedly held that travel tends only to establish the existence of a highway of the ordinary width or as laid out, although it may cover only a part. *Bartlett v. Beardmore, supra; State v. Wertzel*, 62 Wis. 184. Also, that deviation of travel from the laid-out course of a highway has no effect to change it. *State v. Wertzel, supra; Maire v. Kruse*, 85 Wis. 302. We find no sufficient evidence in this case to establish persistent and customary adverse use or occupation, as a highway, of any portion of the premises in the town of *Randall* claimed by the defendant, for a period of ten years, and therefore no support for the judgment appealed from.

*By the Court.*— Judgment reversed, and cause remanded with directions to dismiss the complaint.