ILLINOIS STEEL COMPANY, Appellant, vs. BUDZISZ and wife, Respondents.

*April 5—September 23, 1902.*

(1-4) *Public lands: Swamp lands or lake?' Evidence: Original survey: Court and jury.* (5-12) *Adverse possession: Evidence: Presumptions: Continuity of disseisin: Re-entry by owner: Attornment: Marsh or overflowed lands.*

1. The official platting of lands by authority of the United States, indicating the character thereof as regards whether swamp or marsh lands or lands covered by the waters of a lake, as the same appeared to the official surveyors at the time the original survey thereof was made, is *prima facie* evidence as to their then character in fact in an action involving the question of whether they were a part of the public domain and subject to sale to private parties.

2. A *prima facie* case made by evidence of the character indicated in the preceding paragraph, after the lapse of a term of years so long that it is difficult to establish definitely, if at all, from the mouths of witnesses, the conditions existing at the time of the original survey, should be deemed conclusive in the absence of clear and satisfactory evidence to the contrary.

3. A *prima facie* case made in the manner indicated in the first paragraph should not be deemed so disturbed as to reasonably permit a finding contrary thereto, by evidence of witnesses whose personal knowledge does not reach back further than to within ten years of the time of the original survey and who do not agree between themselves as to the conditions during the time covered by the testimony, there being evidence of changes during the time intervening between the survey and the period covered by their testimony, which will account for the difference between the conditions claimed to have been observed by them and those apparently discovered by the government surveyors.

4. Mere flat, marshy lands along a river bank, submerged in many or most places by water on a level, substantially, with that of the river,—the stream, with its bed, banks and current, being well defined through the entire territory,—cannot be legitimately considered as having the physical characteristics of the bed of a lake or the legal characteristics thereof, especially where the lands were surveyed and sold as part of the government domain.

5. The facts essential to adverse possession must be established by clear and satisfactory evidence, the presumptions being in favor of the true owner till facts are so established indicating continued disseisin of such owner for the full period necessary to divest him of his title. The foregoing rule is not satisfied by mere general statements of witnesses not based on facts warranting them, nor in the face of facts conclusively established rendering adverse possession not within reasonable probabilities.

6. The facts, that during substantially the whole period of an alleged adverse possession of land the alleged hostile possessor exercised no more dominion over one part of the land than of another, that many persons located thereon and appropriated parts thereof in severalty for homes without consulting him or recognizing him as proprietor in any way, that he made no objection to their conduct as an invasion of his rights, and that he never treated the premises as his property in the manner that an owner naturally would, are inconsistent as a matter of law with adverse possession by such alleged possessor, and such facts being established, they should rule the controversy as to such adverse possession as a matter of law.

7. If an owner of land be disseised thereof by another, any notorious re-entry by the former in person or by his authorized 'agent for the purpose of dispossessing the disseisor, will effectively' interrupt and put an end to the latter's adverse possession, regardless of the length of time the interruption continues.

8. That which actually breaks the continuity of adverse possession ends it for all purposes. The disseisor of the true owner may, by a fresh disseisin, start a new period of adverse possession, but cannot thereby obtain any benefit whatever from prior possession.

9. The essentials. of an entry effective to break an adverse possession will vary according to the character of the premises involved.

10. A re-entry of a mere casual or secret character will not interrupt an adverse possession. The re-entry, to have that effect, must be *animo clamandi,* and either known to the occupant or characterized by acts or circumstances from which knowledge on his part would be reasonably inferred.

11. If an adverse occupant of land attorns to the true owner the disseisin of the latter is thereby interrupted.

12. Entry by the true owner, upon premises not physically occupied adversely so as to permit physical disturbance thereof, the premises being marsh or overflowed land not inclosed and having no artificial objects thereon maintained by the adverse occupant, susceptible of physical, visible interference, and a survey

of the premises, stakes being located to indicate the bound-
aries thereof, and exploring and traversing the premises from
day to day for a considerable period of time, *animo clamandi*,
so as to reasonably charge the adverse occupant with knowl-
edge that his possession is challenged and that an opportunity
exists for him to vindicate the same if he desires, is sufficient
to break the continuity of the disseisin.

[Syllabus by MARSHALL, J.]

APPEAL from a judgment of the circuit court for Milwau-
kee county: EUGENE S. ELLIOTT, Circuit Judge. *Reversed.*

Action of ejectment to recover possession of part of gov-
ernment lot 2, section 33, town 7, range 22 E., in Milwaukee
county, Wisconsin, particularly described in the complaint,
which is in the usual form. The answer contains a general
denial and a claim of title in the defendants by adverse pos-
session.

The following was established by the evidence: The sec-
tion referred to was surveyed as part of the public domain of
the United States prior to the year 1835. That part east
of the east meander line of the Milwaukee river was desig-
nated as lots 1 and 2, lot 2 being the southerly part thereof.
The course of the river, as per the first government survey,
and a second made in 1836, and other surveys since made
and maps admitted in evidence, from the north boundary line
of the section to the outlet of the river into Lake Michigan
at the southerly end of lot 2, is as follows: Southeasterly
from said north boundary to a point where the east meander
line of the river reaches to within about 300 feet of the lake
at a point north of the east and west center line of the sec-
tion; thence southwest about forty-three rods; thence south
southeast about sixty-two rods; thence east to Lake Michigan.
In a state of nature the territory between the meander line on
the east and that on the west side of that part of the section
between the outlet of the river and an artificial channel from
the river to the lake, constructed after the government sur-
veys before mentioned, about one half mile north of the

natural outlet, consisted of a long sandy ridge of land from 100 to 300 feet wide on the east side, and wet, marshy land on the west side, the ridge and low marshy land being separated by a bayou connecting with the river at the south and north ends thereof. The territory west of the bayou was highest at the north end. From as early as 1845 it was mostly covered with water of sufficient depth for navigation, in many if not most places, by canoes and rowboats. The water, generally, was too deep for marsh grass to grow in. The land, where submerged, was generally covered by weeds, flags and wild rice, but the growth was not so dense as to prevent navigation with boats. The land on the west side of the river, for a considerable distance, was of the same marshy nature. In 1835 the water was not as high within a foot or two as later. The low land was covered mostly with marsh grass. It had the appearance of and was called a marsh. Although the water became higher in subsequent years, so that weeds and flags and wild rice to some extent took the place of the marsh grass, the territory continued to be called a marsh. That part of fractional section 33 east of the Milwaukee river, since the time of the government survey, has commonly been called Long Point. Daniel Darnell was the first person to have any private interest therein. It took his name to some extent, being called "Darnell's Float." From about 1845, for a few years, a shipyard was operated west of the north end of the bayou, by a man named Jones. From that, the territory between the bayou and the east meander line of the river came to be called "Jones Island." In 1835 the entire territory between the river and the lake was examined by Daniel Wells, Jr., and others, with a view of purchasing the same. The land consisted of seventy-seven acres and a fraction. The result of such examination was that Wells purchased an interest in government lots 1 and 2. The entire section was entered at the government land office by Daniel Darnell July 30, 1835.

About that time he assigned his certificate of entry and interest in the land to Albert G. Ellis, to whom the land was patented as early as 1838.

The meander lines, as established by the government survey, are not shown by the evidence produced on the trial. They are as follows: Commencing at the meander post between sections 28 and 33 on the west bank of Lake Michigan, S. 11 chains, S. 5 degrees E. 51 chains, south 10½ degrees E. 18 chains to the mouth of the Milwaukee river and a meander post there set on the lake shore. From such post S. 79 degrees W. 2 chains, N. 6 degrees W. 9.25 chains, N. 42 degrees W. 8½ chains to the mouth of the bayou; N. 44 degrees W. 16 chains, N. 5½ chains, N. 37 degrees E. 3½ chains, N. 44 degrees E. 12½ chains, 6 to the head of the bayou, N. 22 degrees W. 16 chains, N. 38 degrees W. 15½ chains, N. 51 degrees W. 13.77 chains to the corner of sections 28, 29, 32 and 33.

Prior to 1845 the title to the territory described became vested in many persons, each having an undivided interest therein. Such judicial proceedings were duly had that in 1846 a judgment in partition was duly rendered, awarding to each of such parties in severalty his just proportion of the land, the whole tract having been previously surveyed and platted so as to enable the court to make such award. The disputed land is located in block 195 and a platted street between such block and block 194. Block 195 is the southwesterly part of the island. Block 194 is on the westerly side of the island. The two blocks are bounded on the east by a platted street. They are bounded or limited on the west by the meander line of the Milwaukee river. Block 195 is bounded on the south by the bayou. The plaintiff, by mesne conveyances, was the owner in fee of the two blocks mentioned, at the time of the commencement of this action. On the trial it established the right to recover if Jones Island, so-called, was part of the public domain of the United States

Illinois Steel Co. v. Budzisz, 115 Wis. 68.

The above sketch was taken from the map made in 1846 at the time of the partition proceedings.—Rep.

which it had a right to transfer to private ownership and the patent title had not been divested by adverse possession. Prior to 1872 several persons, strangers to the patent title, occupied parts of the island. The adverse holdings were apart from each other. They were, as stated by some of the witnesses, all over the island. One of the settlers was Gottlieb Truher. He sold his place to Jacob Muza in 1872 for $100, not making any written conveyance. Muza occupied such place, with slight interruptions, continuously from the time he purchased the same till the commencement of this action. Some time prior to 1890, and not earlier than 1885, Muza designated a place on the island for one Reer to locate. The latter made a fill at the place designated, of sufficient size for the foundation of a house, and constructed one thereon. Thereafter he enlarged the filled space and inclosed the same on three sides with a fence, leaving an opening at the back part of his lot, and thereafter continued to extend the fill till he occupied the entire premises described in the complaint. He occupied the same continuously from the time the house was built till 1890, when he sold his right to the premises to the defendant, who immediately took possession thereof and occupied the same till the commencement of this action.

There was evidence to the effect that Truher, in 1872, claiming possession of and dominion over the entire island, sold all his rights to Muza, and that thereafter the latter exercised dominion over the territory continuously till this action was commenced, except as he surrendered portions thereof from time to time to persons desiring to locate homes thereon; that in 1887 there were upwards of 200 settlers on the island; that the number largely increased thereafter before the commencement of this action. The acts of possession which witnesses testified that Muza exercised were as follows: As soon as he purchased of Truher he explored the island, traveling part of the time on foot and part of the

time in a boat. Immediately thereafter he commenced to improve the island. He continued to improve it till this action was commenced. The improvements were made chiefly by permitting persons to settle on the island, not exacting any compensation therefor except that they should aid in making the territory suitable for habitations. All the settlers did more or less work in improving the island under Muza's direction. The brush on the island was all cleared off and put into the low places. Filling was done by using ashes and all material that could be obtained. Some trees were planted. Some structures were made to prevent inroads from the waters of the lake. During all the time it was generally understood that Muza controlled the island. Persons who desired to settle thereon looked to him for directions in improving the territory. Undesirable characters were prohibited by him from coming upon the island. Some persons who came to fish and hunt were compelled by him to go away. Truher, being called as a witness, testified that he never claimed any interest in any part of the island except that occupied by his house, and that he did not sell or pretend to sell any other interest to Muza.

There was evidence tending to show that during some portion of 1875 Muza was absent from the island and at Oshkosh; that his house was, during such absence, occupied by another party, though his household furniture remained therein. There was some dispute as to whether he sold the house to such occupant and thereafter purchased it back. He explained that his absence was only temporary, that it was without any intention to change his home or abandon the island, and that while he was away he kept an agent at the island to look after his interests. The evidence was undisputed that Muza made no claim whatever that any person who lived on the island at the time he went there was a trespasser upon his rights or that he had any control over those portions of the island occupied by such persons; that many

of the settlers who located on the island subsequent to 1872 did not consult or recognize him in any way as proprietor of the territory; that he made no claim that their conduct was an invasion of his rights or collected or attempted to collect any rent from any of the settlers, or demanded or received any compensation from any of them for the privilege to locate on the island, other than in the making of improvements, as before indicated, for the mutual interests of the settlers; that in 1876 blocks 194 and 195 were surveyed and the exact location of all settlements thereon determined at the instance of the owner of the patent title; that considerable time was occupied in making the survey; that stakes were placed by or under the direction of the surveyor, indicating the boundaries of the blocks, and that all of the houses were numbered; that thereafter an agent was sent to the island to interview the occupants of such houses and to make leases with them; that a large number of such leases were made; that all of such transactions were open and notorious; that none of the settlers made any claim to a right of possession under Muza; that he made no claim that the attitude of the owner of the patent title was an invasion of his rights, or any objection to the acts of such owner; that in 1887 the territory was again canvassed for leases by an agent of the owner of the patent title; that a large number of leases were thereby obtained; that such canvass was open and notorious, the agent going to substantially all the settlers; that no one, during such time, disputed the claim represented by such agent; that thereafter the lessees generally refused to recognize the leases and pay rent.

At the close of the evidence plaintiff's counsel moved the court for a verdict in its favor, which motion was denied. The jury rendered the following verdict:

"(1) At the time referred to in the complaint, was and is the paper title to the premises described in the pleadings, in the plaintiff? _A._ (By the court, by consent of counsel) Yes.

"(2) Was the property in question at the time the patent therefor was issued by the United States, naturally a part of the bed of Lake Michigan, or some arm or bayou thereof?
A.　Yes.

"(3) Was the property in question at the time the patent therefor was issued by the United States naturally a part of the bed of some meandered lake or pond? A.　Yes.

"(4) Was the property in question at the time the patent therefor was issued by the United States, naturally a part of the bed of a river? A.　No.

"If you answer either one of questions 2, 3 and 4 'Yes,' the remaining two of such questions need not be answered.

"(5) Have the defendants and their grantors and predecessors in title combined, usually cultivated or improved the premises in question continuously for a period of twenty years or more immediately preceding the commencement of this action? A.　Yes.

"(6) Had the defendant, *Budzisz,* and his privies, Treher (or Reher) and Muza, occupied the premises in question continuously for twenty years prior to the beginning of this action, on the 1st day of July, 1897, by such actual, open, notorious, exclusive and continuous possession as such premises were adapted to and as was reasonably sufficient to attract the attention of the true owner and put him on an inquiry as to the nature and extent of the invasion of his rights?
A.　Yes.

"(7) At the time of the commencement of this action were the defendants in possession of the property in controversy?
A.　(By the court) Yes.

"(8) Did the defendants unlawfully withhold from the plaintiff the possession of the property in controversy?
A.　No."

Plaintiff's counsel moved the court to set aside the findings of the jury, except the first, as contrary to the undisputed evidence, and for judgment in its favor. Later such counsel moved the court to set aside the verdict and grant a new trial. Thereafter judgment was entered on the verdict in favor of defendants.

For the appellant there were briefs by *Van Dyke & Van Dyke & Carter,* and oral argument by *W. E. Carter.*

For the respondents there were briefs by *Fiebing & Killi-lea* and *M. C. Krause,* and oral argument by *O. J. Fiebing.*
The following opinion was filed June 19, 1902:

MARSHALL, J.   We understand that by the answers to
questions 2 and 3 of the special verdict the jury decided that,
when the patent from the United States under which appel-
lant claims was made, the *locus in quo* was part of the bed
of Lake Michigan and was on the lake side of the meander
line thereof. In no other way do the two findings harmonize.
One is to the effect that the property in dispute, at the date
of the patent, was a part of the bed of Lake Michigan or some
arm or bayou thereof. That is, as we take it, that it was
part of the bed of the lake proper, or of some bay or other
basin or channel forming really a part thereof in that it was
supplied by water therefrom. There was but one meandered
lake in the vicinity of the premises in controversy. That
was Lake Michigan. When the jury said by one finding that
such premises were covered by the waters of Lake Michigan
or of some arm or bayou thereof, and by another that they
were within the meandered line of a lake, if they decided
anything with sufficient definiteness to form a legitimate
basis for the application of legal principles, it was that the
*locus in quo* was within the meander line of Lake Michigan.
How they reached that conclusion we are unable to perceive.
There appears to be no dispute in the evidence, that when the
government survey was made and the lands patented there
was a low, sandy ridge, wholly separating Milwaukee river
from Lake Michigan, except when the water of the latter
was cast over such ridge or caused to intrude into the mouth
of the river by high winds from an easterly direction; that
such ridge extended south to the mouth of the river, a point
some 120 rods from the property in dispute; and that the
meander line of the lake then was and ever since has been
on the east side of the ridge and not at any point nearer to

such property than about 700 feet. That unquestionably puts the disputed premises outside the meander line of Lake Michigan, and does not leave them within the meander line of any other body of water. The meander line of Milwaukee river was west of the property in dispute several hundred feet. The territory between it and the meander line east of the sandy ridge was run out by the government surveyors as land, not as a lake or pond. There is no evidence that the two lines were intended for, or were in fact, opposite bound-aries of a lake. If there was a body of water there in fact, having the characteristics of a lake, it certainly was not a meandered body. It follows that findings 2 and 3 are without any support whatever.

If we eliminate from the verdict the element as to the *locus in quo* being within a meandered body of water, and treat it simply as a verdict to the effect that the premises were in the beginning a part of the bed of a body of water having the characteristics of a lake, though not recognized as such by public authority, we are still unable to find evidence to warrant it. The region, as before indicated, is within terri-tory surveyed by the United States and platted as land. At the time of the survey the whole of Jones Island, so called, the region between the bayou—which was wholly on the west side of and separated from the lake by the sandy ridge spoken of, and was a mere by-pass for water from the river from a point a little above the east and west center line of section 33 to a point where the river crosses the east and west eighth line of the south half of the section—and the east meander line of Milwaukee river, was run out as a part of government lot 2 of said section. The indications are unmistakable that it did not appear to the surveyors, at the time their work was done, to be covered by a permanent body of water, but was a marsh. There is no direct evidence in the record as to the conditions then existing, or which existed for some ten years thereafter—during which time the evidence is undisputed

that the water raised a foot or two—except the work of the government surveyors and the evidence of Daniel Wells, Jr. Respondent produced a large number of witnesses as to the condition of the island, respecting water thereon, from 1845 down to the time of the trial, but no testimony whatever respecting prior conditions. They may have been very different in 1835 from what they were in 1845 and later. The work of the government surveyors, with the evidence of Mr. Wells and common knowledge, we may say, that there have been great variations in the level of Lake Michigan in the past sixty years, indicates almost to a moral certainty that in 1835 Jones Island was a marsh and not a lake in any sense. Mr. Wells testified that the water was one or two feet lower in 1835 than it was some time thereafter; that it was the lowest in 1835 that he had ever seen it. He said that he explored the region with a view of becoming part owner thereof, and that such purpose was carried out by his purchasing some twenty or thirty acres of fractional section 33, which was about seventy-seven acres in extent; that between the west side of the sandy ridge forming the shore of the lake, going north from the mouth of the river, there was marsh land, with some parts thereof above water and some portions submerged; that it was called a marsh; that it was bounded on the westerly side by the easterly line of the river. He spoke of a map which was offered in evidence, indicating that it correctly exhibited the conditions existing in 1836. That shows the region in question, then, to have been neither river nor lake, but distinctively a marsh. The fact that it was surveyed and sold as land, though not conclusive of its character by any means, is *prima facie* proof on the point, and, standing alone, should prevail till overcome by some clear evidence—something much better than mere inferences from the testimony of witnesses as to conditions ten years later not inconsistent with those the surveyors appear to have found, witnesses who differ between themselves and speak from their recollec-

tion of conditions which existed forty or fifty years ago. We fail to find any such clear evidence in the record, while the *prima facie* case, spoken of, is supported by the evidence of Mr. Wells and by quite persuasive circumstances, particularly the notorious changing character of the level of the lake.

There is another view of the evidence which, in our judgment, leaves the findings of the jury, above discussed, without support. Giving all the effect we reasonably can to the evidence as to the condition of Jones Island since 1845, there is no controversy but that it consists of flats, connected along substantially the whole of the westerly side thereof with the bed of Milwaukee river, such as are ordinarily found along most rivers. The river itself, when the government survey was made, was well defined through the entire region. It had banks, a bed, and a movement of water uniformly toward the lake. The island, so called, was wholly outside thereof. The territory within the banks of the river, and that constituting the marsh, were not submerged by a continuous sheet of water so that the identity of the stream was lost therein, giving to the territory the characteristics of a lake, as is sometimes the case. The stream, throughout its whole course, was not only well defined at the dividing line between it and the flat lands along its bank, but such bank was, by proper authority, distinctly marked in the field by meander posts at the time of the government survey, and shortly thereafter the limits of the river were carefully determined for the purposes of navigation. To say that swamp lands, which exist here and there outside the shore lines, proper, of a river, the identity of the stream being clear, constitute lakes, merely because they are covered by water in many or most places, would be without precedent and unsupported by authority. Probably one of the most extreme cases in the books where territory, having the characteristics of a swamp and being so

covered by water as to render the same unfit for anything
but fishing and hunting, has been held to be a lake, is *Ne-pee-*
*nauk Club v. Wilson,* 96 Wis. 290, 71 N. W. 661.   The situ-
ation of Mud Lake, the one there in controversy, differed
from that in question, first, in that there was no stream that
could be properly called a river; second, in that it was me-
andered by the government and recognized as a lake, the bed
being conceded by the United States to be vested in the state.
If either of those elements had been absent there, as they were
here, the decision might have been very different.   If both of
such elements had been absent there, as they were here, it is
difficult to see how the conclusion arrived at could have been
reached.   To lay down a rule permitting the state, in its
trust capacity, barring loss by delay, to claim the marsh and
swamp lands along our rivers as beds of lakes, where it may
be shown that in the beginning they were more or less covered
by water, would be without authority and would lead to most
disastrous results.

The evidence on the subject last above discussed was very
different on the former appeal from what it is now.   We were
then unable to satisfactorily determine whether, when the
land was patented, there was a well-defined separation be-
tween Milwaukee river and Lake Michigan, northerly from
the southerly extremity of section 33, leaving Jones Island
in the river basin instead of in that of Lake Michigan.   Now
that is plain.   The river was then, as it ever since has been,
entirely separated from Lake Michigan. Down to a point some
120 rods south of the disputed premises, throughout its entire
course from the north line of section 33 till it entered the
lake, it had banks, a bed, and a current.   It was a river,
strictly so called, and there is no dispute about it.   The wit-
nesses on both sides testified in harmony on that point.   Be-
tween it and the lake, in the southerly half of the section,
there was, first, the marshy region called Jones Island, in-
cluding the premises in controversy, then a narrow, shallow

channel called the bayou, having, as before indicated, no con-
nection whatever with Lake Michigan.. East of that was the
unbroken, sandy ridge testified to by all the witnesses upon
both sides, forming the divide between the basin of the river
and that of the lake. The shore line of the stream on the
west side of the marsh indicated with reasonable clearness
where the marsh ended and the river commenced, and it was
marked accordingly by the government surveyors by proper
meander posts at significant points. The same condition,
as regards low, marshy or swamp lands, existed on the west
bank of the river as on the east bank. No one ever supposed
that such lands were included in the bed of the river or in
the bed of a lake. The lands upon the west side were sur-
veyed and sold by the government at an early day, and have
been held and improved as private property for upwards of
half a century. No doubt a river may so broaden out as to
lose its character as such and become a lake, but nothing of
that kind can reasonably be claimed here. The water's edge
of the stream, forming the boundary of a mere marsh or
swampy region along its banks, the stream having the legal
and physical characteristics of a river and such region those
of a lake, the bed being surveyed by public authority and
sold as land, would be an unheard of and we should say an
impossible situation. That such a marshy region cannot be
reasonably considered an independent permanent body of
water, though in fact covered by water in many places, and
as having the legal and physical characteristics of a lake,
seems too clear for argument. It has always been properly
designated as marsh or swamp land, according to circum-
stances.

For all the reasons given we must hold that the answers to
questions 2 and 3 of the special verdict are contrary to the
evidence.

Since the premises in controversy were subject to private
ownership at the origin of the paper title upon which appel-

lant relies, the judgment appealed from is wrong unless that title was cut off by twenty years' continuous adverse possession by respondent and Jacob Muza, under whom he claims. If the appeal were to turn, necessarily, on whether Muza disseised the true owner, it is by no means clear that support for the judgment appealed from could be found in the record. The essential elements of adverse possession cannot properly be found to exist except upon testimony of a positive and satisfactory character. That does not mean that such elements must all be established by direct evidence, but that they must be established in a clear and satisfactory manner by evidence, direct or circumstantial, of a positive, unequivocal character. *Meyer v. Hope,* 101 Wis. 123, 77 N. W. 720. It is not consistent with that to find such elements from mere general statements of witnesses, not based on facts clearly warranting them, nor in the face of facts clearly established which are so inconsistent with adverse possession as to render it altogether improbable. Muza testified that the possession he had of the island was just the same in one part as in another; that his claim was no different as to one part thereof than as to any other part. In the light of that testimony, if there were many parts of the island over which he did not exercise any control whatever, it would seem that respondent's claim of adverse possession wholly fails. He relies upon evidence to the effect that Muza used all the island as a true owner might reasonably have done, devoting the same to such purposes as it was adapted to; that he used the same for a hunting and fishing ground; that he prohibited others from coming thereon; that he improved the island by building dikes and filling up low places, and, generally, that he assumed dominion over it. Muza so testified, but upon cross-examination he was unable to testify definitely as to habitually prohibiting persons from coming upon the island, or that any one in particular, other than respondent, located thereon by his permission. He admitted, as we read his evidence,

that a large number of persons settled thereon without ask-ing his permission to do so, or his objecting thereto; that they went there and located, treating the territory as no man's land, without his giving out any indication to them that he considered their conduct an invasion of his rights. A long, searching cross-examination failed to show, as before indi-cated, that any person in particular, except respondent, out of over 200 persons who located on the island, did so by first obtaining his permission. None of them paid him anything, or treated him as proprietor, in any of the ordinary ways of dealing with the owner of property, so far as we can discover. He said they helped him improve the island and that he allowed them to locate thereon with the understanding that they should so aid him, but it nowhere appears that he treated the island, in either its improved or unimproved state, as his property. A number of settlers were sworn, who testified that they went upon the island without supposing that Muza had any better right than they had to go there; that they did not know of him in the matter. It seems, looking at the whole evidence, that it is established beyond reasonable controversy that the persons who settled upon the island did so generally without reference to Muza, and remained there without recog-nizing that he had any property right in the island, or right to control it. That is so inconsistent with the theory that he exercised the acts of a rightful owner over the territory in dispute—that he claimed it as his property and dealt with it as such—as to render it highly improbable, if not contrary to all reasonable probabilities.

If we could pass the infirmity last discussed, so as to reach the conclusion that the true owner was disseised by Muza and that such disseisin continued down to the time blocks 194 and 195 were surveyed and staked out by authority of such owner in 1876, the houses thereon being then num-bered and leases obtained from the occupants thereof, such circumstances would stand as an insurmountable barrier to

respondents' right to recover. If an owner of land be dis-
seised thereof by another, so as to start a period of adverse
possession in favor of the latter, any notorious entry thereon
by such owner or his agent by his direction, for the purpose
of dispossessing the adverse occupant, operates to interrupt
the running of the statute. It terminates the period of ad-
verse occupancy absolutely and for all purposes. The statute
can be set running again only by a fresh disseisin, which will
constitute merely the commencement of another period of
twenty years, regardless of the length of time the interrup-
tion of the adverse occupancy continued. Anything that act-
ually breaks the continuity of adverse possession of property
renders it harmless as regards the title thereof, no matter
what may subsequently occur. *Johnston v. Fitzgeorge,* 50
N. J. Law, 470, 14 Atl. 762; *Bowen v. Guild,* 130 Mass.
121; Pingrey, Real Prop. § 1195. Actual entry upon prop-
erty by the true owner, of a mere casual character or by
stealth, is not sufficient to break the continuity of a disseisin
of him, nor is a re-entry sufficient which is not known to the
adverse occupant or characterized by acts from which knowl-
edge on his part would reasonably be inferred. But there is
no such infirmity in this case. There is no question but that
the entry of the true owner was made *animo clamandi* and
that it was of the most public character. It was of such a
character that if Muza was exercising that control over Jones
Island which he claims, he must in all reasonable probability
have been informed thereof and of its purposes while the
acts in respect thereto were in progress. They occupied a
considerable length of time. A surveying party operated
upon the ground for a sufficient length of time to accurately
run out and mark in the field the boundaries of the blocks.
Thereafter, as before indicated, numbers were placed on the
houses, and that was followed by an assertion of ownership
to all the occupants of the houses, and by obtaining acknowl-
edgments from them that their occupancy was by permission

of the true owner, such acknowledgments being in the form of leases. The latter circumstance alone was amply sufficient to interrupt any existing adverse occupancy of all the property, since no visible use was being made thereof—except of those parts occupied by the houses—which could be physically disputed. *Russell v. Erwin's Adm'r,* 38 Ala. 44; *Thompson v. Pioche,* 44 Cal. 508; *Haynes v. Boardman,* 119 Mass. 414. In view of the character of the premises, no infirmity whatever is perceived in the entry as regards its effective character to break any existing disseisin of the true owner. It was good as a matter of law.

The most essential element in such a case is the *"animus clamandi,"* and that may be inferred from circumstances. It is not necessary that it should be made manifest by any formal declaration to anybody. The necessary purpose being clear, if the element of notoriety is sufficient to bring the situation home to the attention of the adverse occupant, if he is paying such heed to his possession as a person under the circumstances would ordinarily pay, that is sufficient. All those elements were so fully satisfied in this case that the court should have decided as a matter of law that any adverse occupancy existing prior to the assertion of the ownership by the true owner in 1876 was effectually interrupted thereby, and have looked for a fresh disseisin more than twenty years prior to the commencement of this action; and in the absence of any evidence tending to clearly establish such later disseisin, should have taken the case from the jury in favor of appellant.

We have searched the evidence in vain for some proof of a disseisin of the title under which appellant claims subsequent to the occurrences above discussed and more than twenty years before this action was commenced. If the result were otherwise than we have found it to be on that point, there would still be an insurmountable difficulty which would prevent respondents from recovering in this litigation. In

1887, appellant's predecessor in title caused that part of Jones. Island owned by it, including the disputed premises, to be explored, and each of the settlers thereon to be notified of the true state of the title, and required to recognize the same by taking a lease of his holding, most of whom complied with such requirement. The fact, if it be a fact, that some of them did not understand the purpose of the paper they signed, does not militate against the circumstances stated being effective to interrupt the adverse occupancy existing as to the vacant part of the territory. Their ignorance may be material in litigation between the plaintiff and them. No case of that kind is before us. The entry upon the disputed territory was so long continued and was characterized by such acts that it must have indicated to Muza the purpose thereof. It is considered that, as to that part of the island not occupied by settlers, the circumstance of the agent exploring the entire region, calling upon all persons located thereon, proclaiming to them the true state of the title, going upon the territory upon many occasions as a matter of right and as an owner would naturally go, and for the notorious purpose of asserting title thereto, was sufficient as a matter of law to interrupt the adverse occupancy by Muza if such occupancy existed. What will interrupt disseisin must necessarily vary with the character of the property involved, the same as what acts will constitute actual occupancy essential to adverse possession must so vary. There were no fences on the particular property in controversy to be thrown down, no buildings to take possession of, no physical situations created by Muza that could well be disturbed, indicating an intent to reclaim possession, except by doing just what was done. The premises not occupied by settlers being only open marsh or swamp land, and largely covered by water, all that the true owner could do, to indicate that he challenged the right of any hostile claimant, was to go upon the territory in the attitude of a true owner, demanding recognition by all wrongful occupants found thereon, continuing operations for such a length of

time as to bring home to the attention of all hostile claimants that their claims were defied and that an opportunity existed for them to seek vindication if they supposed such claims to be legitimate. Interference with adverse possession of property by going upon the same habitually, ignoring such possession, if the nature of the property will not readily admit of any other way of asserting title, and such way be continued for such length of time as to clearly manifest a purpose to re-enter, will break the continuity of the adverse occupancy and turn to naught all such prior possession. Tyler, Ejectment, 110. Our conclusions are that, if Muza was in the adverse occupancy of the premises in controversy in 1876, such occupancy was broken by a re-entry then made; and there is no satisfactory evidence of a fresh disseisin of the true owner more than twenty years before the commencement of this action. But if there was such evidence, the disseisin was again broken in 1887.

Counsel for appellant presented for consideration several assignments of error not covered by what has been said. But as the conclusions already reached render a new trial unnecessary, we will pass over such assignments. They moved the court, upon the coming in of the verdict, to strike therefrom the answers which we have held to be clearly unsupported by any credible evidence, leaving only the findings that appellant, at the time of the commencement of the action, was the owner of the premises in dispute by title under a government patent, and that they were then possessed by respondent, and for judgment on the verdict as corrected and the undisputed evidence. The result of our conclusions is that such motion should have been granted. It follows that the judgment appealed from must be reversed and the cause remanded with directions to grant such motion.

*By the Court.*—So ordered.

A motion by the respondents for a rehearing was denied September 23, 1902.