ILLINOIS STEEL COMPANY, Appellant, vs. JEKA and wife, Respondents.

*October 18, 1904—January 10, 1905.*

*Appeal and error: Assignments of error: Waiver: Ejectment: Adverse possession: Construction of statutes: Cross-examination: Material and immaterial error.*

1. Where no attention is paid in the argument to an assignment of error except to refer to the record and suggest: "While we submit that in portions of the charge of the court, to which exceptions were taken, as shown in the record, there was error, we will not trouble the court with further discussion of them," the supreme court will not search the record, carefully, to determine whether the instructions were, or were not, strictly accurate.

2. In an action of ejectment, the evidence on the subject of adverse possession, is *held* sufficient to carry that question to the jury.

3. In the determination of the question of adverse possession, possession dependent upon marked boundaries under subd. 1, sec. 4214, Stats. 1898, must not be confused with that accompanied by actual improvement of the premises under subd. 2 of said sec. 4214.

4. The physical taking and enjoyment by acts sufficient, reasonably, to suggest to the true owner that his dominion is thereby defied and the extent thereof, satisfies all the essentials of certainty as to the boundaries of adverse possession, dependent

on cultivation or usual improvement, and is sufficient to dis-
seize the true owner, not only of the particular spot where
the first visible disturbance of the surface occurred, but of
surrounding land, the hostile possession of which is plainly
thereby suggested.

5. Whether the essentials of adverse possession are satisfied or not
by a given state of circumstances must be determined by the
verdict of the jury, under proper instructions.

6. The use of cross-examination is not a mere privilege subject
to discretionary judicial authority,—it is a right.

7. It is not prejudicial error to rule out a question asked for the
purpose of laying the foundation for impeachment, when it
refers to immaterial matter.

8. Rulings of the trial court, sustaining objections to questions
asked on cross-examination, which are not clearly prejudicially
wrong, will not be condemned on appeal.

9. In an action of ejectment, where the defense was twenty years'
adverse possession, dependent on actual improvement of the
premises, it is not error to sustain objections to a question call-
ing for the precise boundaries of such possession, since it is
only necessary that the premises should be put to use by acts
of dominion, such as to suggest, reasonably, the extent of the
hostile invasion.

10. It is not prejudicial error to refuse to permit a witness to answer
a question, where, in answer to several other questions, he
has given the information sought.

APPEAL from a judgment of the circuit court for Milwau-
kee county: ORREN T. WILLIAMS, Circuit Judge. *Affirmed.*

Action in ejectment. The complaint was in the usual form.
The defendants pleaded adverse possession under the ten and
twenty years statutes. On the trial it was conceded that
plaintiff was entitled to recover unless defendants were, upon
evidence establishing their defense of adverse possession.
Such evidence tended to, if it did not conclusively, show such
possession by them and those with whom they were in privity
from some time in 1881 to the commencement of the action
February 26, 1896, unless the continuity thereof was broken
by the John Selin, hereafter mentioned, acquiring of the
holder of the record title a leasehold interest in the property.
There was a conflict of evidence as to whether such circum-

stance occurred to carry the cause in respect thereto to the jury. There was evidence on plaintiff's part, supposed by the trial court to be sufficient to carry the question involved to the jury, that Jacob Muza as early as 1873 took possession of the disputed premises in defiance of the true owner and thereafter remained continuously in the actual, hostile, exclusive and notorious occupancy thereof till in 1881, when he sold the same for a trifling sum to John Selin, giving him no paper transfer thereof; and that Selin and those claiming under him continued the adverse possession existing at the time of such transfer until the commencement of this action, by these circumstances: As soon as Selin received the property from Muza he inclosed the same with a fence, built a house thereon and occupied it as a home for himself and family. The condition thus created was continued until some time in 1893 when Selin sold the premises to Joseph M. Konkel, not giving him any paper transfer thereof. Konkel upon so receiving the property took possession thereof and prepared it for use by a tenant. It was occupied accordingly for a short period of time when Konkel sold the property to defendant, *Xavier Jeka,* not giving him any paper transfer thereof. *Jeka* upon so receiving the property, took possession thereof and occupied the same till the action was commenced.

The main contention upon the trial was whether there were possessory acts of the disputed premises by Muza sufficient to satisfy the statute as to what is essential to disseise the true owner of land so as to create adverse possession thereof by another, and if there were such acts whether the condition thus created was continued for a sufficient length of time, prior to the commencement of Selin's possession, to make with the period that elapsed thereafter, before the commencement of this action the full period of twenty years requisite to satisfy the statute. Muza did not inclose the premises or put any structure, strictly speaking, thereon. The most the evidence tended to show he did in regard to the premises, is

fairly indicated by the following brief summary of his evidence:

I improved the property in dispute from 1872 till I gave it to Selin. I improved it as I could, filling the same with stones and ashes and what I could get. I did that just as for myself. My brother was coming from the old country. I was preparing the premises for him. I did the first filling in 1873. I did filling every year thereafter till I sold to Selin. I cut willows and wheeled ashes and filled in on the property. No one interfered with my work. I claimed to be the owner of the property from the time I commenced filling till I gave it to Selin. I do not know how long the tract of land was or how wide it was. I did not measure it. It was all marsh around where I filled. When I gave the property to Selin it was water and marsh around it. There was a ditch on the property washed out and I filled that. There was water on the property when I transferred it to Selin, but I do not know how deep it was. There was nothing to show just where the boundaries of the property were, till I staked it out at the time of the sale to Selin. It was all marsh when I took possession. I filled it extra because I wanted to fix it up for my brother. I did more on that property than on the rest of the marsh. My brother did not come from the old country so I gave the property to Selin. I staked it out for him at the time. The Selin lot was higher than the rest of the marsh. All the lot was high. I filled it so it was higher.

There was considerable evidence corroborating the foregoing and much evidence discrediting it, both in Muza's cross-examination and the testimony of other witnesses. There was evidence tending to show that Muza settled near the premises in dispute some time in 1873 and maintained a home there for many years continuously; that the Selin premises were part of a marshy tract of land north of the mouth of the Milwaukee river and between Lake Michigan and the river, called "Jones Island;" that Muza from the time he entered thereon, as aforesaid, assumed, at least, leadership in appropriating the island for residence and other purposes; that he generally, somewhat as an owner would, directed the

improvement of the island by filling in low places and protecting the land from inroads by water from the lake.

The jury found, in effect, as follows: When this action was commenced the paper title was in plaintiff. Defendants and their grantors and predecessors in title occupied the premises continuously for more than twenty years before the action was commenced. Such occupancy was actual, open, notorious, exclusive and continuous and reasonably sufficient to attract the attention of the true owner and put him on inquiry as to the nature and extent of his rights. Defendants were in possession of the property when the action was commenced. They did not unlawfully withhold the same from the plaintiff. Judgment was rendered thereon for defendants. Such proceedings were duly taken on behalf of the plaintiff as to preserve for consideration upon appeal the questions discussed in the opinion.

For the appellant there was a brief by *Van Dyke & Van Dyke & Carter,* and oral argument by *W. E. Carter.*

For the respondents there was a brief by *Fiebing & Killilea* and *M. C. Krause,* and oral argument by *H. J. Killilea.*

The following opinion was filed November 15, 1904:

MARSHALL, J. The foregoing brief statement, it is believed, brings to view all of this case necessary to an understanding of the few questions discussed in the brief of appellant's counsel.

As we understand it, counsel do not expect the case to be examined other than sufficient to enable the court to pass upon their claims that the verdict is unsupported by evidence, which is involved in each of three assignments of error, and that the trial court erred in the admission and rejection of evidence. True, there is an assignment suggesting that improper instructions were given, but no attention is paid thereto in the argument except to refer to the record for the instructions excepted to, and suggest this:

"While we submit that in portions of the charge of the court, to which exceptions were taken, as shown in the record, there was error, we will not trouble the court with further discussion of them."

Since there is no antecedent of the words "further discussion of them" and the procedure here, well known to the learned counsel, is that an assignment of error unaccompanied by any argument pointing out the particular matter referred to and giving reasons, or attempting to, why it should be held well taken, is not to be regarded as necessarily calling for examination,—we feel warranted in concluding that it is not expected that we shall search the record, carefully, to determine whether the instructions were, or were not, in all respects, strictly accurate.

The question of whether there was evidence to legitimately carry to the jury the subject of the alleged adverse occupancy of the disputed premises by Muza for several years prior to the commencement of Selin's occupancy thereof, which is a vital point in the case, must be examined in the light of principles stated in previous cases involving similar evidence as to various parts of "Jones Island," so called. There was a claim of adverse possession by Muza in each of such cases, dependent for its efficiency upon whether his acts were sufficient to disseise the true owner, set the statutory period of twenty years of such condition running and preserve it until it merged into a like condition caused by the acts of another in privity with him. This case seems to have been fairly submitted to the jury in the light of such previous adjudications. *Illinois S. Co. v. Budzisz,* 106 Wis. 499, 82 N. W. 534; *Illinois S. Co. v. Budzisz,* 115 Wis. 68, 90 N. W. 1019; *Illinois S. Co. v. Jeka,* 109 Wis. 449, 84 N. W. 1119; *Illinois S. Co. v. Bilot,* 109 Wis. 418, 84 N. W. 855, 85 N. W. 402; *Illinois S. Co. v. Jeka,* 119 Wis. 122, 95 N. W. 97; *Illinois S. Co. v. Budzisz,* 119 Wis. 580, 97 N. W. 166. See, also, *Batz v. Woerpel,* 113 Wis. 442, 89 N. W. 516.

No reason is perceived why any question decided in those cases, which is material to this one, should be reconsidered. It is believed that the decisions, there necessarily resulted from secs. 4207, 4213, and 4214, Stats. 1898, and elementary principles long and firmly established. The mere fact, if it be a fact, that such principles and the calls of the statutes were somewhat more definitely pointed out in such cases, or some of them, than theretofore, and that some misunderstanding existed by reason of unguarded expressions in previous opinions, here and there, should not be mistaken for the establishment of any new doctrine. It is not infrequent that courts find a very old and familiar rule to have become so involved by mere phrasing thereof, or illegitimate applications of the same, or both, that a new point to refer to is seen to be essential to certainty in its administration. That suggests a review of the subject, involving a restatement of the rule with an attempt to refer to new, or to bring again into prominence old, indications of its limitations and scope. Having done that, the danger of losing the beneficial effect thereof is generally best avoided by, for a time at least, pointing to the law as thus declared when the subject is again presented calling for its application, rather than by discussing the matter anew.

It cannot be doubted that if Muza entered upon the premises in dispute, as testified to by him, and commenced filling in the low places, indicating to the true owner, if he paid reasonable attention to his property, a hostile purpose to adversely appropriate such premises, he thereby effectually planted thereon the standard of a hostile invader. As soon as the first significant visible work of improvement was made it was notice to the true owner not only of such hostile invasion, but of the nature thereof. It is not the law, as we understand it, that the filling in of low places upon premises as testified to in this case constitutes, necessarily, taking actual possession only of the particular places filled, and that

in order to take such possession of a parcel of land such as that in question for a building spot by filling the same up, it is necessary to raise the entire surface thereof so as to indicate with precision by visible marking the precise extent of the hostile invasion.

In considering this subject one should not confuse adverse possession, dependent upon marked boundaries under subd. 1, sec. 4214, with such possession accomplished by actual improvement of the premises under subd. 2 of the said section. In the latter class of cases the physical disturbance of the premises by putting the same to some use to which they are adapted, sufficient to disseise the true owner, may affect by relation the surroundings, so far as the nature of such disturbances naturally suggest the claim of dominion by the adverse occupant extends. In a territory suitable for cheap residence lots, and occupied by numerous persons as such, a hostile entry and commencement of improvement plainly indicating a purpose to lay out such a lot, might well be held sufficient to disseise the true owner, not only of the particular spot where the first visible disturbance of the surface occurred, but of surrounding land, the hostile appropriation of which is plainly thereby suggested. Such being the case much of the infirmity which appellant's counsel seem to think exists in defendant's case as to Muza's possession is readily seen not to exist in fact, even if it be considered that there is no evidence that he graded the lot so as to visibly change the entire natural surface thereof. It must be conceded that there is much evidence that he entered upon the premises and did filling thereon, from time to time and year to year, for five or six years prior to the commencement of Selin's possession, and that there is some evidence that he created an artificial surface over the entire premises. True, his cross-examination and the evidence of several witnesses tend to show that no visible change in the premises was wrought by him, but

that merely rendered the truthfulness of his claim in that re-
gard a jury question. Such being the case, in view of the
law that physical taking and enjoyment by acts sufficient, rea-
sonably, to suggest to the true owner that his dominion is
thereby defied and the extent thereof, satisfies all the essen-
tials of certainty as to the boundaries of adverse possession,
dependent upon cultivation or usual improvement, the case
was properly submitted to the jury.

True, as counsel suggest, the disseisin of the true owner
and constructive adverse possession that will take away title
from one and vest it in another must be exclusive, hostile,
continuous and notorious, and where there is no paper title
to refer adverse occupation to, indicating constructively the
boundaries thereof, there must be actual possession of a nat-
ure to clearly acquaint the true owner with the fact that his
rights are set at defiance and the extent thereof. It must not
be supposed that the law in that regard, so often declared by
this court, is not fully appreciated in applying the same as
we do to the evidence in this case. It is often easy to state a
rule of law, and not easy to apply it to a mass of evidentiary
matters. What acts are necessary to notify the true owner of
land of a hostile invasion thereof; and what are necessary to
indicate the territorial limits of such invasion and what are
necessary, if disseisin shall have once been effected, to ef-
ficiently indicate continuance thereof necessarily varies with
the size of the premises claimed, the location thereof, the
character of the same and a great variety of circumstances.
Hence, generally, whether the essentials of adverse possession
are satisfied or not by a given state of circumstances must be
determined by the verdict of a jury, under proper instruc-
tions.

While, as before indicated, the law on this subject was so
fully discussed in the former cases referred to that no further
discussion thereof is needed, we may well give emphasis

thereto by quoting from the opinion of the court in the lead-
ing case in California, *Brumagim v. Bradshaw,* 39 Cal. 24,
45, the following:

> "Acts of dominion over a town lot, which would be suffi-
> cient to establish an actual possession, might be wholly in-
> adequate to that end, as applied to a tract of one thousand
> acres; and, on the other hand, the herding of cattle, for a rea-
> sonable time, on a tract of one hundred acres, suitable only
> for that purpose, and accompanied by a claim of title, might,
> under certain circumstances, establish possession of it; whilst
> the pasturing of cattle on a town lot, suitable only for build-
> ing purposes, would be wholly insufficient. The general prin-
> ciple which underlies all this class of cases is, that the acts of
> dominion must be adapted to the particular land, its condi-
> tion, locality and appropriate use. The philosophy of the
> rule is, that by such acts the party proclaims to the public
> that he asserts an exclusive ownership over the land, and the
> acts which he performs are in harmony with his claim of title.
> Hence they must be such as to give notice to the public; or,
> in the language of Justice BALDWIN, in *Wolf v. Baldwin,* 19
> Cal. 313, it must be 'an open, unequivocal, actual posses-
> sion—notorious, apparent, uninterrupted and exclusive—
> carrying with it the marks and evidences of ownership.' "

The elucidation and application of the principle thus stated
in *Illinois S. Co. v. Bilot,* 109 Wis. 418, 84 N. W. 855, 85
N. W. 402, leaves no very good reason for going astray under
the delusion that adverse possession without an inclosure
must necessarily be characterized by a physical, constant,
visible occupancy by improvement of every part of the prem-
ises,—that the hostile invader must actually lay his hands, so
to speak, upon the entire territory and keep them there as
plainly indicating the extent and character of the occupancy
as if such premises were covered by a mantle. The words of
the statute do not expressly, nor by reasonable implication,
suggest any such thing, nor can any authority in support
thereof be found. The judicial declarations generally, rightly

understood, are in harmony with this, as for example in *Booth v. Small,* 25 Iowa, 177, the court said:

"Possession of land is the holding of an exclusive exercise of dominion over it. It is evident that this is not and cannot be uniform in every case, and that there may be degrees in the exclusiveness even of the exercise of ownership. The owner cannot occupy, literally, the whole tract,—he cannot have an actual *pedis possessio* of all, nor hold it in the grasp of his hand. His possession must be indicated by other acts. The usual one is that of inclosure. But this cannot always be done, yet he may hold possession, in fact, of uninclosed land by the exercise of such acts of ownership over it as are necessary to enjoy the ordinary use of which it is capable and acquire the profits it yields in its present condition. Such acts being continued and uninterrupted will amount to actual possession."

True, the Iowa court did not have the precise statutory aid to guide it which we have, but that does not impair the force of the quotation since the "use in the usual way" of the common law which such court evidently had in mind is substantially the same as "usually improved" in our statutes.

Under the assignment of error relating to rulings on evidence, numerous instances are cited to our attention where questions on cross-examination were ruled out. We shall not review the same in detail. We are persuaded that the trial judge restricted the cross-examination rather too closely. It must be borne in mind that cross-examination is regarded one of the most efficient means of discovering the truth, and so long as there is any reasonable ground to suppose that it is being pursued legitimately it should not be disturbed. Often it is the only weapon available for laying bare a tissue of falsehoods having all the semblance of truth. The use of it is not a mere privilege subject to discretionary judicial authority,— it is a right. The judge may regulate its use, stopping just short of any disturbance of the right itself. To go further is

improper. The right is so valuable to litigants and the opportunity to abuse it so constant and often embraced that some regulation thereof from the bench is necessary. Few judicial duties require greater care in performance than that of so guarding and restricting cross-examination, attempted, as to prevent the latter without impairing the former. There is some ground for holding that there was a failure in that regard in this case, but whether to such a degree as to prejudice appellant has given us some trouble.

This question propounded to Muza was ruled out: "When you testified before in the Alexander Budzisz case, didn't you swear that you did not know that you ever fished in Oshkosh alone?" We are unable to perceive how the answer to that, one way or the other, could have had any material bearing. It was obviously asked to lay a foundation for impeachment on the theory that a considerable period of absence by Muza from the vicinity of the premises in dispute would break the continuity of his possession thereof. It does not seem to have been given proper significance that the extent of the occupancy in this case, unlike that in some others, was not necessarily dependent upon substantially continuous presence of the disseisor at or in the immediate vicinity of the premises. After the adverse occupancy was commenced, if we may believe the testimony of Muza, he created such changes in the physical condition of the land as to indicate clearly a hostile invasion of the true owner's rights. Having raised his flag, so to speak, on the premises by commencing the preparation thereof for a residence lot, absence therefrom thereafter for any period of time, short of such as to indicate abandonment of such purpose, would not, as a matter of law, break the disseisin. The standard of the invader being once efficiently planted by some physical change in the surface of the land, sufficient to disseise the true owner, it might under such circumstances be relied on to preserve such condition for a reasonable length of time. Absence from the premises for a

short interval may be immaterial, the true owner not assert-
ing any right thereto in the meantime, there being a return to
the same by the disseisor and further acts thereon by him con-
sistent with the first invasion, clearly indicating a continu-
ance thereof. If the disseisor relies on acts to show his pos-
session, which require his personal presence, such as prohib-
iting others from going upon the property and customary use
of same for fishing and fowling, as in some of the "Jones
Island" cases, his absence for even short periods of time
might be quite material. Under the circumstances of this
case it does not seem that the fact, if it be a fact, that Muza
was engaged in a fishing venture for a short time at Oshkosh,
either with another or alone, was so clearly material as to
warrant us in disturbing the decision of the trial judge.

It is not reversible error to rule out a question asked to lay
the foundation for impeachment when it refers to immaterial
matter. Jones, Evidence, § 855; *Waterman v. C. & A. R.
Co.* 82 Wis. 613, 52 N. W. 247, 1136; *Schuster v. State,* 80
Wis. 107, 49 N. W. 30; *Kaime v. Omro,* 49 Wis. 371, 5 N.
W. 838. Every such question, upon objection being made,
presents for consideration whether the statement suggested
thereby to have been made and to be inconsistent with one
made on the trial, is material. The trial judge's decision on
that goes to competency and must prevail on appeal, unless
clearly wrong. Of course, if the subject of the interroga-
tory is material, he has no discretion as to whether or not to
permit the foundation for impeachment to be laid,—it is a
matter of absolute right, not a mere privilege. Jones, Evi-
dence, § 855. The ruling under discussion, it seems, can-
not be condemned as clearly wrong, so cannot be at all. Sev-
eral other rulings cited to our attention are governed likewise.
We will therefore not further refer to them.

Muza was asked whether he did not testify, on a former oc-
casion, that his possession of one part of "Jones Island" was
the same as that of any other; that his right was the same in

Illinois Steel Co. v. Jeka, 123 Wis. 419.

one place as in any other and that his claim of right was like-
wise the same. Some reasons occur to us why those questions
could be rightly regarded immaterial. However, the rulings
are of such doubtful propriety that a contrary disposition of
the matter would strike us with more favor. The circum-
stances under which it was claimed the witness testified, as
suggested in the questions, were not made to appear. The
trial judge, notwithstanding the notoriety of the "Jones
Island" cases, could not take judicial notice of such circum-
stances, nor could the jury view them as matters of common
knowledge. The suggested evidence may have been very ma-
terial on a former occasion and not material on the trial of
this case. If, on such occasion, there was no serious question
but that Muza took and held adverse possession of some part
of the island by creating and maintaining structures thereon
and no question but that there were other parts thereof,
which, during the period of his claim, were in the possession
of others acting independently of him, and yet he alleged ad-
verse possession of the entire island, on the greater part of
which there were no visible indications thereof, and the title
to some such portions was dependent on the validity of his
general claim, a statement by him that his "possession,"
"claim," or "right" as to one part of the island was the same
as that of any other, might be quite sufficient and important
on a subsequent trial involving similar circumstances in con-
tradiction of evidence inconsistent therewith, and yet be im-
material as to a claim of adverse possession to a small part of
the island, grounded on actual, continuous improvement and
occupation of that particular part. In the absence of any in-
dication in the questions, or otherwise, of similarity of cir-
cumstances on this trial, to those characterizing the alleged
former statements, it is not clear that the court was wholly
without justification for holding that such statements, which
at best seem to have been merely the witness' conclusions, de-
pendent, perhaps, upon his idea of his legal rights, were im-

material. The court was influenced, it seems, by the fact that, the controversy here was necessarily to turn on whether the physical condition of the particular premises in question was so changed by Muza as to sufficiently evidence to the true owner a hostile invasion of his rights, and a disseisin of him thereof continuously for several years. We cannot see clearly that the rulings were prejudicially wrong, and therefore decline to condemn them.

Complaint is made because this question, propounded to Muza, was ruled out: "Did the south boundary of the Selin lot extend down to the old harbor?" The claim that the ruling on that is wrong is based on the idea that it was essential to adverse possession by Muza that the precise boundaries of such possession should be marked in some way. That is wrong as we have seen. It was only necessary that the premises should be put to use by acts of dominion over the same, such as to suggest reasonably the extent of the hostile invasion. If a house had been constructed thereon and dominion exercised by the invader over territory in the vicinity of the structure for a reasonable space adjacent thereto by acts similar to those of an owner of a dwelling generally, we apprehend that no one familiar with the law would claim that the adverse occupancy was limited to the particular space covered by the structure, or that it would be essential to adverse possession of the surrounding territory to the extent ordinarily used in connection with a dwelling house of the nature of the one so constructed that it should be staked out and fenced, or the boundaries otherwise marked by physical objects. For example, a highway by user, is not confined to the wagon path. It is deemed to extend on either side thereof sufficient to satisfy the needs of the public for such highway. Under some circumstances, it might be held to extend to the full width of a legal highway. *Bartlett v. Beardmore,* 77 Wis. 356, 46 N. W. 494; *Randall v. Rovelstad,* 105 Wis. 410, 81 N. W. 819; Elliott, Roads & S. § 174. Upon the principle

we have referred to, many courts have held that a highway by adverse occupancy is of the full width of a legal highway. That such width is suggested by the existence of the wagon path. *Whitesides v. Green,* 13 Utah, 341, 44 Pac. 1032; *Sprague v. Waite,* 17 Pick. 309; *Marchand v. Maple Grove,* 48 Minn. 271, 51 N. W. 606; *Bowers v. Barrett,* 85 Me. 382, 27 Atl. 260; *Pillsbury v. Brown,* 82 Me. 450, 19 Atl. 89; *Davis v. Clinton,* 58 Iowa, 389, 10 N. W. 768.

Complaint is made because Muza was not permitted to answer this question: "Now tell us what more you did on this lot than on others." Irrespective of whether the ground upon which that question was ruled to be improper, the ruling was not prejudicial, inasmuch as the witness gave the information sought, in answer to several other questions. He testified that he filled the lot preparatory to use thereof as a home for his brother; that he did not treat it as he did the island generally; that he filled it.

Viewing the complaints as to rulings on evidence in groups, all have been considered. Counsel call attention in a general way to a large number of such rulings by referring to the pages of the printed case where they can be found. We have given such attention thereto as to enable us to discover that counsel were warranted in saying the rulings made the basis for argument are fair samples of all, to which objection was made. Consideration of the samples includes the whole. We have not been able to discover any sufficient ground for reversing the judgment appealed from.

*By the Court.*—Judgment affirmed.

A motion for a rehearing was denied January 10, 1905.