**COURT OF APPEALS
DECISION
DATED AND FILED**

**July 15, 2025**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP184**

STATE OF WISCONSIN

Cir. Ct. No. **2022CV633**

IN COURT OF APPEALS
DISTRICT III

LYNN RHYNER,

    PLAINTIFF-RESPONDENT,

JOEL RHYNER,

    PLAINTIFF,

  V.

PETER KERNOSKY AND MARY JANE KERNOSKY,

    DEFENDANTS-APPELLANTS.

APPEAL from a judgment of the circuit court for Marathon County: LAMONT K. JACOBSON, Judge. *Affirmed*.

Before Stark, P.J., Hruz, and Gill, JJ.

¶1 GILL, J. Peter and Mary Jane Kernosky appeal from a judgment, entered by the circuit court following a bench trial, granting Lynn Rhyner title to a

disputed area of land through adverse possession.[1]  The Kernoskys' and Lynn's properties are adjoining, and the disputed area largely consists of a grass lawn in an urban residential setting.

¶2      On appeal, the Kernoskys contend that Lynn failed to demonstrate adverse possession because the acts of her predecessors in interest—including planting the grass lawn, maintaining the lawn, and installing vegetable and flower gardens—were, as a matter of law, insufficient to constitute open, notorious, exclusive, and hostile possession.  They assert that there is no Wisconsin case law demonstrating that it is possible for a party to successfully assert an adverse possession claim for an "urban lawn" based only on the installation and maintenance of a lawn "where there has never been" a substantial enclosure.

¶3      Despite the disputed area being in an urban residential setting, Lynn was not required to demonstrate the existence of a substantial enclosure to successfully prove her adverse possession claim.  Lynn could prove her adverse possession claim by showing, in addition to the requirements listed in WIS. STAT. § 893.25(2)(a), that her predecessors in interest actually occupied the disputed area and "[u]sually cultivated or improved" the area.  *See* § 893.25(2)(b).  Based on the circuit court's undisputed factual findings, Lynn successfully proved these elements.  Her predecessors in interest took a muddy, undeveloped area and turned it into a lawn.  They planted grass, installed a garden and a flower bed, and

---

[1] Pursuant to a stipulation in the circuit court, Lynn's husband—Joel Rhyner—was dismissed from the adverse possession action because Lynn owns the property individually. *See* WIS. STAT. § 841.02 (2023-24).  Where appropriate, we refer to several individuals relevant to this appeal using their first names.

All references to the Wisconsin Statutes are to the 2023-24 version unless otherwise noted.

"fastidiously" maintained the lawn for more than 20 years.  For these reasons, we affirm.

## BACKGROUND

¶4      Lynn is the owner of residential property located in the Town of Wausau.  In 1999, she received title to the property via a quitclaim deed from her parents, Wilbert and Hazel Kell, who purchased the property as a vacant lot in 1966.[2]  From at least 1968 until 1990, Lynn's aunt and uncle owned the property adjacent to and directly to the south of the Kells' property, and the Kernoskys purchased that property in 1990.

¶5      Lynn commenced this adverse possession action against the Kernoskys in October 2022 after her mother passed away and she discovered that the southern portion of what she believed was her property was actually located on the northern end of the Kernoskys' property.  The disputed area has been described by the parties as an "urban lawn" and a "city lot," and it forms a rectangle that is approximately 28.5 feet north-to-south, 140 feet east-to-west, and extends 1.8 feet into Lynn's garage.  The southern boundary of the disputed area is marked by an iron "T-Post" located close to the southwest corner of the disputed area, but the area is not, nor has it ever been, otherwise fenced or demarcated.

¶6      The Kernoskys conceded that Lynn had successfully proven adverse possession of the 1.8 feet of property where Lynn's garage stands, but they

---

[2] Wilbert and Hazel retained a life estate in the property, and they each continued to live at the property until their deaths.

disputed whether the remaining area should be titled to her. The matter eventually proceeded to a bench trial, and the following pertinent evidence was introduced.

¶7      In 1967, after purchasing the vacant lot, the Kells obtained a building permit from the Town to construct a house and a garage on the property. The permit included a map of the property mistakenly showing that the Kells' property line extended approximately 25 feet to the south from the actual property line. The Kells did not conduct a survey of the property prior to constructing the house and garage. As a result of the foregoing, part of the garage was constructed 1.8 feet south of the Kells' actual property line and encroached into Lynn's aunt and uncle's property.

¶8      The Kells' house and garage were completed in 1968, and they moved in that year. At that time, Lynn was approximately ten years old. No grass had been planted when the Kells moved into their home, and the disputed area was muddy. Upon moving into the house, Wilbert planted grass in the disputed area.

¶9      Lynn testified that her parents treated the disputed area as their yard and would use it as such. For example, Lynn's father "often" "took care of the yard" up to the T-Post and was "fastidious about how the yard looked": he fertilized and seeded the lawn, mowed the grass, and raked the leaves. When patches of the grass would "dry up," Wilbert would refill them with new seed and grow new grass. Lynn's husband, Joel, who had been visiting the property since 1976, also testified that Wilbert maintained the lawn up to the T-Post.

¶10      Lynn and Joel testified that Wilbert mowed the lawn in the disputed area on a weekly basis in the summer months. Lynn testified that her father maintained the yard from 1968 until his death in 2011. Lynn also stated that she did not recall her aunt and uncle or the Kernoskys ever mowing in the disputed

4

area. Joel testified that Lynn's aunt and uncle mowed "[u]p to" the T-Post. Moreover, Joel stated that he began mowing the yard in 2021 and that, with respect to the disputed area, he mowed up to where the Kernoskys were mowing, which was to the south side of the T-Post.

¶11   Looking at a satellite image of the two properties introduced at trial, Lynn testified that she observed a clear dividing line between the disputed area lawn and the Kernoskys' lawn. Namely, Lynn stated that the grass on the north side of the T-Post was much greener and more "full" than the grass south of the T-Post and that the difference was attributable to her father being a "perfectionist" about his lawn maintenance.

¶12   Additionally, Lynn stated that she would occasionally mow the lawn when she lived on the property and that she, like her father, also mowed up to the T-Post. Lynn testified that when she was a child, she used the disputed area for recreational activities and that she and her friends would "play like normal kids" in the disputed area.

¶13   As early as 1968, the Kells planted and maintained a flower bed just south of the garage as well as a garden in the northwest portion of the disputed area. Lynn stated that her mother maintained the flower bed from before 1970 until she passed away in 2022 and that the garden is still there today. Likewise, Lynn stated that her mother maintained the garden "[f]rom about the time they purchased the property" until a tree fell and destroyed it in 2019 and that the garden was fenced at some point. Mary Jane and a neighbor testified, however, that the garden stopped being maintained around 2011 after Wilbert passed away.

¶14   In 2009, the Kells installed a septic holding tank underneath the surface of the disputed area after receiving a permit from Marathon County. A

5

final inspection report demonstrates that the septic tank was installed 7.5 feet south of the garage and 15 feet north of the T-Post, with a septic vent visibly protruding from the ground. Lynn testified that she "never heard of any dispute" between her parents and her aunt and uncle or the Kernoskys regarding the now-disputed area, including any disagreements over the location of the septic system. The daughter of Lynn's aunt and uncle testified that she did not recall there ever being a discussion or issue regarding the disputed area when her parents owned the property south of the Kells' property.

¶15 Conversely, Mary Jane testified that she believed she and her husband, Peter, owned the disputed area up to the flower garden—i.e., up to within roughly three feet of the Kells' garage. Mary Jane and Peter each testified that since purchasing the property in 1990, their family had used the disputed area south of the flower garden for volleyball, sledding, and ice skating. In addition, Mary Jane and Peter testified that both their family and the Kells mowed the disputed area. Mary Jane further stated that she and Peter were on vacation in Florida when the Kells installed the septic tank and that it was installed without their knowledge. Upon their return, they became "furious" about the tank but "allow[ed]" the Kells "to keep it there because they were elderly," the tank did not disrupt the Kernoskys' use of their property, and the Kernoskys "didn't want to like cause [the Kells] any issues." Mary Jane elaborated on this latter point, testifying that if the Kells could not have installed the septic tank on the disputed area, they would have had to install it on the north side of their property, which would have required the Kells to install a service road pursuant to an ordinance.

¶16 Following the parties' written submissions of closing arguments, the circuit court issued an oral ruling awarding Lynn legal title to the disputed area. The court determined that Lynn had met her burden of proving adverse possession

of the disputed area based upon the occupation and use of the area by her predecessors in interest from 1966 to 1990, and prior to the Kernoskys' purchasing their property. According to the court, Lynn's aunt and uncle did not contest the Kells' ownership of the disputed area during this time period.

¶17 Moreover, from 1968 to 1990, the Kells improved the disputed area—i.e., the area from the garage up to the T-Post—by planting a grass lawn and "maintaining that lot." *See* WIS. STAT. § 893.25(2)(b)2. The Kells subsequently installed and maintained a garden and flower bed and "care[d] for" the area. The court cited the satellite image of the adjacent properties and stated that "the color of the grass changes … from a brighter green to a darker green," with the darker green being on the disputed area and the Kells' deeded property. Relying on *Burkhardt v. Smith*, 17 Wis. 2d 132, 115 N.W.2d 540 (1962), the court determined that the Kells' actions from 1968 to 1990 "would alert someone, a stranger, that [the] yard is being used as an owner of property would." The court entered judgment in favor of Lynn, and the Kernoskys initiated this appeal.

## DISCUSSION

¶18 "Review of an adverse possession claim presents a mixed question of fact and law." *Wilcox v. Estate of Hines*, 2014 WI 60, ¶15, 355 Wis. 2d 1, 849 N.W.2d 280. "We accept the circuit court's findings of fact unless they are clearly erroneous. However, whether these facts are sufficient to establish adverse possession is a question of law that this court reviews de novo." *Id.*

¶19 Generally, "[a] person who, in connection with his or her predecessors in interest, is in uninterrupted adverse possession of real estate for 20 years … may commence an action to establish title under [WIS. STAT.] ch. 841." WIS. STAT. § 893.25(1) (adverse possession not founded on a written instrument);

*see also* **Wilcox**, 355 Wis. 2d 1, ¶25 (stating that § 893.25 "codifies the common law elements of continuous, open, notorious, exclusive, and hostile possession"). Real estate is possessed adversely "[o]nly if the person possessing it, in connection with his or her predecessors in interest, is in actual continued occupation under claim of title, exclusive of any other right," and "[o]nly to the extent that it is actually occupied." Sec. 893.25(2)(a), (b). In addition, the property must be "[p]rotected by a substantial enclosure" *or* "[u]sually cultivated or improved." Sec. 893.25(2)(b)1.-2.

¶20 The burden of proof for an adverse possession claim is on the party asserting the claim. **Wilcox**, 355 Wis. 2d 1, ¶20. "The evidence of possession must be 'clear and positive and must be strictly construed against the claimant.' The court must make all reasonable presumptions in favor of the true owner, including the presumption that actual possession is subordinate to the right of the true owner." **Id.** (citation omitted).

¶21 The Kernoskys' challenge on appeal is fairly limited in scope. They do not contend, for example, that any of the circuit court's findings of fact are clearly erroneous or that Lynn could not adversely possess the disputed area through her parents. Instead, the Kernoskys' argument on appeal is that the Kells' actions in the disputed area from 1968 to 1990 were, as a matter of law, insufficiently hostile or open and notorious to meet the standard for adverse possession. They appear to argue that for a party to successfully pursue a claim of adverse possession of a lawn in an urban neighborhood, the party must show that they, or a predecessor in interest, erected a fence, wall, line of trees, structure, or "anything above ground." Because Lynn never proved that an enclosure was ever erected around the disputed area, the Kernoskys argue that her adverse possession claim must fail as a matter of law. In making these arguments, the Kernoskys

assert that there is no Wisconsin case law demonstrating that it is possible for a party to successfully assert an adverse possession claim for an "urban lawn" based only on the installation and maintenance of a lawn "where there has never been" a substantial enclosure.

¶22 As we demonstrate below, a substantial enclosure is not always required for a successful adverse possession claim, even when the property is located in a more urban setting than, say, a farm field. *See* WIS. STAT. § 893.25(2)(b); *Wilcox*, 355 Wis. 2d 1, ¶19. Indeed, Lynn could prove her adverse possession by showing, in addition to the other requirements listed in § 893.25(2)(a), that the Kells actually occupied the disputed area and "[u]sually cultivated or improved" the area. *See* § 893.25(2)(b).

¶23 "Actual occupancy is not limited to structural encroachment which is common but is not the only physical characteristic of possession." *Burkhardt*, 17 Wis. 2d at 138. Rather, "[a]ctual occupancy means the ordinary use of which the land is capable and such as an owner would make of it." *Id.*; *see also* WIS. STAT. § 893.25(2)(b). "Any actual visible means, which gives notice of exclusion from the property to the true owner or to the public and of the [adverse possessor's] domination over it, is sufficient." *Burkhardt*, 17 Wis. 2d at 138. "'Both … the fact of possession and its real adverse character' must be sufficiently open and obvious to 'apprize the true owner … in the exercise of reasonable diligence of the fact and of an intention to usurp the possession of that which in law is his [or her] own.'" *Peter H. & Barbara J. Steuck Living Tr. v. Easley*, 2010 WI App 74, ¶14, 325 Wis. 2d 455, 785 N.W.2d 631 (citation omitted). However, "[a]dverse possession without [e]nclosure need not be characterized by a physical, constant, visible occupancy or improved by improvements of every square foot of the land." *Burkhardt*, 17 Wis. 2d at 137-38.

¶24  "The size and nature of the disputed area are relevant in deciding if the use is sufficient to apprise the true owner of an adverse claim." *Steuck Living Tr.*, 325 Wis. 2d 455, ¶14.  Moreover, the "requirement of continuity is satisfied by activities that are appropriate to seasonal uses, needs and limitations, considering the land's location and adaptability to such use." *Otto v. Cornell*, 119 Wis. 2d 4, 7, 349 N.W.2d 703 (Ct. App. 1984).  Under WIS. STAT. § 893.25, "if the cultivation or improvement in relation to the nature of the use in the area indicates the boundaries of the adverse claim and is usual under the circumstances, such use is sufficient and considered actual occupancy under the statute." *Burkhardt*, 17 Wis. 2d at 134, 138 (discussing WIS. STAT. § 330.09 (1961-62), a prior, yet similar, version of WIS. STAT. § 893.25).

¶25  Here, the disputed area is a side lawn between two relatively small residential lots in a fairly urban setting.  Given its location and setting, we disagree with the Kernoskys' contention that the Kells' planting and maintenance of a lawn cannot, as a matter of law, constitute actual possession.  Rather, based on the circuit court's undisputed findings regarding the Kells' cultivation and improvement of the disputed area up to the T-Post in the urban area, we conclude that the Kells actually possessed the disputed area by these means.

¶26  Like the circuit court, we find our supreme court's analysis and holding in *Burkhardt* particularly apt to Lynn's adverse possession claim.  In *Burkhardt*, the party claiming adverse possession built a lakeshore cottage "which he thought was on the boundary line between his two lots but, in fact," was partially on a neighboring lot.  *Burkhardt*, 17 Wis. 2d at 135.  The disputed area was approximately 13-by-5-feet in size and, prior to the construction of the cabin, was "wild, unimproved" and had "only a few patches of grass."  *Id.*  After completing construction of the cottage, the claimant installed a septic tank and

"cleaned up" the disputed area "by cutting out all dead trees and all the bramble and wild bushes which he stacked and burned." *Id.* The claimant also "dug up and burned all of the dead stumps" from the disputed area, spaded the entire area, which was covered with weeds, and raked and seeded it with blue grass. *Id.*

¶27 In the following years, the cottage was used either by the claimant or his relatives or was rented. *Id.* at 136. During this time, the claimant used the disputed area "in various ways in keeping with the usual occupancy of a lakeshore cottage." *Id.* at 135. For example, he "built up the soil, reseeded the area, and planted trees" on part of the disputed area; built a fence partly around the lawn; added a terrace, walk and rock garden on the side of the cottage in the disputed area; and built a fireplace, flower bed, clothesline, and swings for his children. *Id.* at 135-36.

¶28 On appeal, the supreme court addressed whether the claimant's acts demonstrated that he "usually cultivated or improved" the disputed area. *Id.* at 135. The true owners of the disputed area argued that the "cutting of grass and brush, planting of flowers, grass, and trees, and the installation of temporary and movable equipment is not an open, hostile, and notorious use." *Id.* at 136.

¶29 The court disagreed, noting that "[w]hat might be required to constitute adverse possession of a city lot is not necessarily applicable to rural or lake property in an unimproved area." *Id.* at 139. Given the nature of the disputed area, the court held that the several acts of the claimant—including his building of the cottage, removing dead trees and brush, and putting in a lawn—"would indicate to any stranger that [the disputed area] was usually being used as an owner would use such land in that lake-resort area and thus proclaimed he asserted exclusive ownership." *Id.* at 137.

¶30     Moreover, the court rejected the true owner's inferred argument that the claimant was required to occupy or use "every square foot" of the disputed area "for twenty years" in order to successfully demonstrate adverse possession. *Id.* at 137-38.   The court stated that the "argument that one claiming adverse possession must actually lay his [or her] hands, so to speak, upon the entire lot and keep them there as if covering the premises with a mantle was soundly rejected" in *Illinois Steel Co. v. Jeka*, 123 Wis. 419, 101 N.W. 399 (1904).   *Burkhardt*, 17 Wis. 2d at 138.   Thus, the court concluded that the use the claimant made of the disputed area "was the ordinary use of which such land was capable and while each individual act or improvement did not extend for a complete period of twenty years, outside of the encroachment of the cottage, nevertheless such acts taken together and in relation to the acts performed" when the claimant purchased the property "were consistent with the first invasion and show a continuous and uninterrupted original use by" the claimant "in the usual and ordinary way an owner would use the land surrounding his lake cottage." *Id.* at 138-39.

¶31     Much like the adverse possession claimant in *Burkhardt*, the Kells took a muddy, undeveloped area and turned it into a lawn.   Wilbert planted grass, installed a garden and a flower bed, and "fastidious[ly]" maintained the lawn up to the T-Post.[3]   The lawn maintenance included mowing, fertilizing, and fixing patches of dead grass.   These are all visible acts that would apprise the true owners—Lynn's aunt and uncle—of the Kells' intent to usurp their possession of

---

[3] Earlier in this opinion we noted that the Kernoskys do not argue on appeal that any of the circuit court's findings of fact are clearly erroneous.   We pause to emphasize and specify here that the Kernoskys expressly concede that the Kells planted grass in the disputed area.

the lawn up to the visible T-Post.[4]  *See Steuck Living Tr.*, 325 Wis. 2d 455, ¶14; *Pierz v. Gorski*, 88 Wis. 2d 131, 134, 136-38, 276 N.W.2d 352 (Ct. App. 1979) (stating that the use of a 25-by-100-foot vegetable garden was sufficient to constitute cultivation).  This conclusion is true despite the fact that the garden and flower beds did not extend over the entire disputed area.  *See Burkhardt*, 17 Wis. 2d at 138; *Illinois Steel Co.*, 123 Wis. at 425-26.

¶32      The Kernoskys contend that *Burkhardt* is distinguishable from this case because the disputed area was not "wild land" before 1968 and "'mowing a lawn' [is] not enough to establish adverse possession."[5]  They further argue that the circuit court's adverse possession decision "is a legal and policy nightmare for all urban property owners with adjoining lawns who … are [now] at risk of losing portions of their property based on someone, years ago, planting and maintaining a lawn."

¶33      The Kernoskys are correct that the circuit court in this case did not describe the disputed property, as it existed prior to the Kells' purchase of their property, as "wild land."  However, Lynn did not need to show that the Kells "substantially change[d] the character of the land."  *Cf. Pierz*, 88 Wis. 2d at 134,

---

[4] The Kernoskys contend that if we conclude that "installing and maintaining" a lawn does not constitute "cultivation," we should reverse the circuit court's decision.  However, the term "cultivated" in WIS. STAT. § 893.25(2)(b)2. is used in the disjunctive with "improved."  Thus, Lynn did not need to prove that the Kells cultivated the land.  Even so, the planting and use of a garden, as occurred in this case, can constitute cultivation.  *See Pierz v. Gorski*, 88 Wis. 2d 131, 134, 136-38, 276 N.W.2d 352 (Ct. App. 1979).

[5] In support of this argument, the Kernoskys cite and quote an article from the Wisconsin Lawyer.  The quotation includes citation to an unpublished, per curiam decision from this court, and it appears that the Kernoskys implicitly rely on this case to support their arguments.  This citation violates WIS. STAT. RULE 809.23(3), which prohibits the citation of a per curiam opinion unless exceptions that are not relevant here apply.

137 (stating that the circuit court found that the land at issue in an adverse possession case was "wild land" and that "[i]mprovements sufficient to apprise the true owners of adverse possession of wild lands must substantially change the character of the land"). To hold otherwise would impose a requirement that an adverse possession claimant for property located in a city would need to "substantially change the character of the land" in order to adversely possess it.

¶34 The question related to actual occupancy is whether the claimant successfully demonstrated that they occupied the disputed area by ordinary use of which the land is capable and such as an owner would make of it. *Burkhardt*, 17 Wis. 2d at 138. In this urban setting, the Kells' ordinary use of the disputed area by planting a lawn, maintaining it, and disposing of dead grass, together with installing and maintaining a garden bed and flower bed on the area, clearly constituted visible means that gave notice to the true owners that the Kells occupied the area as owners to the exclusion of others.

¶35 Further, the Kells' actions were sufficient to define the boundaries of the adversely claimed property. Indeed, the Kells' meticulous maintenance of their lawn and the disputed area since 1968 was evidenced at trial by the satellite image, which showed, clearly, a difference in grass quality between the Kells' lawn, including the disputed area, and the Kernoskys' lawn. The circuit court reasonably credited this image as supporting Lynn's adverse possession claim. As Lynn asserts on appeal, "[a]ny observer walking past could see the difference in lawn quality and could determine that the Kells were maintaining" the lawn up to the T-Post.

¶36 Our conclusion is consistent with WIS. STAT. § 893.25 and binding case law, and Lynn's successful adverse possession claim does not create a

"policy nightmare" whereby neighbors will hurry to the courthouse to file adverse possession claims for property located on each other's lawns.  The Kells' actions from 1968 to 1990 went far beyond merely mowing the disputed area, and any reasonable neighbor would have known the Kells were claiming ownership of the disputed area.  Moreover, the evidence shows that this activity was done consistently over those 22 years.

¶37     The Kernoskys' remaining arguments are similarly unavailing.  They assert that Lynn failed to satisfy the hostility requirement of her adverse possession claim because the Kells never filed a lawsuit seeking title to the disputed area, even though the Kernoskys' deed included title to that area.

¶38     "[T]he plain meaning of 'claim of title,'" which "is the statutory equivalent of the common law 'hostility' requirement," "is that a possessor must subjectively intend to claim ownership of the disputed property."  *Wilcox*, 355 Wis. 2d 1, ¶24; *see also* WIS. STAT. § 893.25(2)(a).  "Within the context of adverse possession, '[h]ostility means only one in possession [of the disputed property] claims exclusive right thereto and actual possession prevents the assumption of possession in the true owner.'"  *Wilcox*, 355 Wis. 2d 1, ¶22 (alterations in original; citation omitted).  "'Hostile intent' does not mean a deliberate, wilful, unfriendly animus.  If the elements of open, notorious, continuous and exclusive possession are satisfied, the law presumes the element of hostile intent."  *Id.* (citation omitted).

¶39     Because Lynn satisfied the elements of open, notorious, continuous, and exclusive possession, the Kells' hostility was presumed.  In other words, given the Kells' actions with respect to the disputed area from 1968 to 1990, it is presumed that they subjectively intended to possess the area.  The Kernoskys have

failed to rebut that presumption, and they cite no authority stating that a predecessor in interest must file a lawsuit to satisfy the hostility requirement.

¶40    In addition, the Kernoskys make a blanket statement, unsupported by factual inferences or a record citation, that Lynn's aunt and uncle "were never excluded" from the disputed area. Where there are competing facts about whether an adverse possessor had exclusive control, "the finding is one for the fact finder, not for a[n appellate] court as a matter of law." *Kruckenberg v. Krukar*, 2017 WI App 70, ¶8, 378 Wis. 2d 314, 903 N.W.2d 164. The Kernoskys fail to develop an argument regarding exclusivity that is supported by factual or legal citations, and we will not address this argument further. *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992).

¶41    The Kernoskys similarly argue that they were not excluded from the disputed area. However, by the time the Kernoskys purchased their property, the title to the disputed area had vested in the Kells. "Once title is secured by adverse possession[,] the possessor need not keep the flag of hostility waving forever." *Herzog v. Bujniewicz*, 32 Wis. 2d 26, 33, 145 N.W.2d 124 (1966). A landowner, whether by deed or adverse possession, has "legal title and is presumed to be in possession thereof and the occupation of such land by another person is deemed to be under and in subordination to such legal title unless the land is possessed adversely for the necessary statutory period." *Id.* The Kernoskys did not attempt to rebut that presumption at trial, nor do they attempt to do so on appeal. *See Pettit*, 171 Wis. 2d at 646.

¶42    Finally, the Kernoskys claim that the "minimum standards for property surveys" support their position that the T-Post was not a "monument" or "line of occupation." *See* WIS. ADMIN. CODE ch. A-E 7 (June 2025). Their

16

argument in this regard is somewhat confusing, but as best we understand it, the argument can be summarized in the following manner: Lynn hired a surveyor who produced two surveys, the original survey did not include the T-Post, and, therefore, the T-Post is not the boundary of the disputed area. It is unclear how a surveyor's omission would have any bearing on Lynn's adverse possession claim. The evidence at trial demonstrated that the T-Post marked the southern boundary of the disputed area regardless of whether the original survey identified the T-Post. To the extent the Kernoskys intend to raise some other argument related to the "minimum standards for property surveys," we deem that argument to be undeveloped. *See **Pettit***, 171 Wis. 2d at 646.

¶43   The undisputed actions of Lynn's predecessors in interest on the disputed area for more than 20 years amounted to adverse possession. The Kells' use of the disputed area was sufficiently open and obvious to apprise the true owners of the fact that the Kells intended to possess the area.

*By the Court*.—Judgment affirmed.

Not recommended for publication in the official reports.